IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HECTOR ALVARADO, | ) | CASE NO. 3:16-CV-2563 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE PATRICIA GAUGHAN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| WARDEN, | ) | JONATHAN D. GREENBERG |
| Ohio State Penitentiary, | ) | |
| | ) | REPORT & RECOMMENDATION |
| Respondent. | ) | (Doc. Nos. 5, 14.) |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is the Petition of Hector Alvarado ("Alvarado" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  Currently pending are Alvarado's (1) Motion for Stay and Abeyance (Doc. No. 5); and (2) Motion for Order Directing Respondent to Correct the Return (Doc. No. 14.)

For the following reasons, it is recommended that Alvarado's Motion to Stay (Doc. No. 5) be GRANTED.  It is further recommended that Alvarado's Motion for Order Directing Respondent to Correct the Return (Doc. No. 14) be DENIED WITHOUT PREJUDICE subject to refiling once the stay is lifted.

## I.  Summary of Facts

Alvarado's habeas petition challenges the constitutionality of his conviction and sentence

for murder in the case of *State v. Alvarado*, Lucas County Court of Common Pleas Case No. G-

4801-CR-201301381.  The state appellate court summarized the facts underlying Alvarado's

conviction as follows:

> {¶ 2} In the early morning hours of New Year's Day, 2013, a fight broke out at
> the South Beach Bar on Alexis Road in Toledo, Lucas County, Ohio. Christine
> Henderson suffered a fatal wound to her neck and her fiancée, Stacy Bowen,
> suffered a non-fatal laceration to his upper arm. Appellant, Hector Alvarado,
> was indicted on one count of murder in violation of R.C. 2903.02(B) and R.C.
> 2929.02, and one count of felonious assault in violation of R.C. 2903.11(A)(2).
> The case proceeded to trial by jury. The following is a summary of the evidence
> presented.

> {¶ 3} Megan Gibson, an employee at the South Beach Bar and Grill, testified
> that she was working the door in the early morning hours of New Year's Day
> 2013 when "the bar broke out into a riot." She did not witness the assault on
> Bowen or Henderson. She did, however, clean-up a large amount of blood in the
> area Henderson was standing before she walked outside and died in the bar's
> parking lot.

> {¶ 4} A bar patron, Charles Wells, testified that he and three of his friends were
> on the bar's back patio "smoking weed and drinking beer" when the violent, yet
> short-lived, fight began. He entered the bar, but never engaged in the fighting.
> Instead, he stood back and observed the commotion, keeping his eye on
> appellant because he was "the biggest guy in the bar."

> {¶ 5} Wells explained that during the fight appellant had "an object" in his
> hand. He observed appellant swing the object and noted that "everybody he
> swung on hurried up and got away from him." Wells admitted that his view was
> obstructed at times because "bodies was [sic] moving, chairs was [sic] flying,
> people was [sic] swinging."

> {¶ 6} At one point, Wells observed appellant near Henderson. He explained, "I
> seen him swing on her and she walk [sic] away, she grabbed her neck and walk
> [sic] away.  But I didn't know what had happened right then and there." Wells
> explained that appellant had the object in his hand when he "swung on"
> Henderson.

2

{¶ 7} Before the fight completely subsided, Wells and his friends left the bar through the front door. Wells explained what he observed when he stepped outside:

> A:   All I seen was cars, but I immediately spinned around because it was a crowd of people coming out, there was some people coming out, so then when I seen who was coming out, I turned around and started walking backwards and tripped off the curve.
>
> Q:   Did you see [appellant]?
>
> A:   He came out right behind me.
>
> Q:   What did you see him with?
>
> A:   I seen him with a Mexican girl in one hand. I seen him with a knife in another hand.
>
> Q:   Sure it was a knife?
>
> A:   Clearly I seen the knife. I wouldn't turn my back to him because I just seen him get into it with all these black people and I didn't want him to stab me too. I had my brother and them in the car. They made it in the car. I was walking backwards and my brother and them kept saying, Chuck, get in the car; Chuck, get in the car. I said fuck that. I'm watching him. He got a knife.
>
> Q:   How long did you watch him?
>
> A:   All the way until I got in the car.

{¶ 8} Wells explained that he and his friends came back to the bar later that morning so they could give another friend, a bouncer, a ride home. It was then that he heard Henderson had died and that Bowen had killed her with a bottle. He explained, "I said, hell, no, [appellant] did it."

{¶ 9} Wells did not talk to the police in the early morning hours of New Year's Day 2013. He did, however, receive a phone call from Detective Goodlet on January 8, 2013. He told the detective what he saw and agreed to come down to the station and give a recorded statement. He explained,

> A:   * * * And the only reason why I really, really went down there, because like I say, I know the family and they was

> saying that the girlfriend's boyfriend was the one that
> stabbed her with a bottle and I said, hell no, huh-uh, no.
> And then I called my friend Dave which [sic] was the
> bouncer there that night and he asked me was I going down
> there and I said I'm going to go down there and talk to him.

Q:     Did you ever voluntarily talk to the police before?

A:     Never in my life. Where I come from that's a snitch.

{¶ 10} Wells was able to identify himself on surveillance video and various still photos taken from the video. On cross examination, Wells testified that he and Bowen were not "friends" but that he knew Bowen from the neighborhood and had played basketball with him. He also admitted that he knew Henderson because she drove a recognizable vehicle, a "hot pink truck * * * with cartoon characters on it."

{¶ 11} Dr. Diane Scala–Barnet, a deputy coroner for Lucas County, performed an autopsy on Henderson. She classified Henderson's death as a homicide and determined that a stab wound to the left side of her neck caused a complete transection of the carotid artery. In her opinion, the fatal wound was caused by an instrument with one sharp edge and one dull edge. She ruled out any suggestion that a broken bottle could have caused the wound.

{¶ 12} Dr. Scala–Barnet described the wound track as "lateral to medial and downward." In her opinion, Henderson likely received the wound from a frontal attack but she could not rule out the possibility that the wound was received from an assailant standing behind her. When asked whether it was possible for Henderson to have received the wound while bent over, Dr. Scala–Barnet stated, "[t]hat would be harder to get the downward trajectory * * * It's not impossible, but it's harder to get in there." Dr. Scala–Barnet agreed that if Henderson did receive the wound while bent over, "the assailant would almost certainly have to be lower than her." However, she added that it all depended on where the assailant was positioned relative to the Henderson's body.

{¶ 13} Dr. Scala–Barnet indicated that immediately after being stabbed, blood would have started spurting from Henderson's wound and death would have occurred within a matter of minutes. She indicated that Henderson would have been able to walk after being stabbed, but that she would have felt light headed very quickly.

{¶ 14} Bowen testified that he became involved in the melee after he noticed

4

several of his male friends fighting with people he had never seen before. He didn't know why the fight started and indicated he had no success in trying to break things up. He did not recall fighting with appellant.

{¶ 15} Bowen identified himself, Henderson, and appellant on surveillance footage taken at the bar during the fight. He did not see appellant stab Henderson but he recalled—and the surveillance footage corroborated—that the three of them were in close proximity to each other in the moments before Henderson grabbed her neck and walked away from the melee. However, a table lifted-up and thrown during the fight, obscured the camera at the exact moment Henderson likely received the fatal stab wound to her neck.

{¶ 16} Detective William Goodlet of the Toledo Police Department testified that he interviewed Bowen shortly after the fight. While Bowen admitted to participating in the fight, he was unable to identify anyone he was fighting.

{¶ 17} Detective Goodlet went to a local hospital after receiving information that another potential witness, Basilia Smith, was being treated for injuries she received during the fight. When questioned, Smith admitted to being at the bar and receiving injuries during the melee. However, she was too intoxicated to provide any additional information helpful to the detective's investigation.

{¶ 18} A few hours after he interviewed Smith, Detective Goodlet received surveillance video from the bar's numerous interior and exterior cameras. The time frame of the preliminary video spanned from 1:39:00 a.m. through 2:15:00 a.m. The detective and his team watched the video in real time but found it grainy and "really tough to follow." Detective Goodlet and his team of investigating officers made a determination to start analyzing footage of the back lot where Henderson's body was found and work back in time in an effort to determine where and when she was injured. At the time, they knew the identities of very few people in the bar. During this period of the investigation, appellant's identity was unknown, but he was one of several "persons of interest" because of his proximity to the victims during the melee.

{¶ 19} A short time later, Detective Goodlet obtained additional surveillance video. After the Detective and his team watched the additional footage, they invited Bowen back in to the station and showed him still shots of the footage. Bowen was able to identify himself, but was not able to identify any of the suspects.

{¶ 20} About a week after the incident, Detective Goodlet received a call from one of the men who had been working security inside the bar. Based upon that conversation, Detective Goodlet made contact with Wells. Detective Goodlet described his first phone conversation with Wells, as follows:

5

> He told me what he had seen, where he was at, he stated he was at the bar with his brother. He's—he's having a good time. There's somebody yelling, security, security, security. He comes out, sees just fighting. People fighting everywhere. He states he runs out of the bar and while he's outside the bar, he sees a large Hispanic male come out of the bar. He's got a girl in his right hand and he's got a knife in his left hand. He said he saw this Hispanic male run, run from the scene, and he said that's the guy, he did it.

A week later Wells came down to the station.  During a recorded interview, but after Wells identified a "big Mexican with tattoos on his head," Detective Goodlet showed Wells still shots from the surveillance video.  Wells was able to point out the appellant.

{¶ 21} At trial, Detective Goodlet indicated that the majority of Wells' recorded statement was consistent with Wells' testimony in court, with one exception; during the recorded interview, Wells did not indicate that "he observed [appellant] punching or making some striking movement at Miss Henderson."

{¶ 22} Video footage from outside the bar demonstrated that appellant arrived at 12:46 a.m. with three women.  A few moments later, video footage from inside the bar depicted the three women walking past the bouncer without being patted down. Detective Goodall testified that the video showed appellant entering the bar after being given a "cursory pat down * * * at best."  Detective Goodall pointed out that the bouncer did not pat appellant down towards his ankles or around his back.

{¶ 23} Video footage demonstrates that appellant was on the bar's back patio until approximately 1:55 a.m.  At that time, appellant moved into the view of camera 3, inside the bar.  At 1:55:58 a.m., appellant is seen on footage from camera 3 and camera 12, seated, taking a brief phone call.  There is no sign of any fighting. At 1:59:29 a.m., appellant abruptly stands up.  At the same time, camera 11 depicts a fight on the dance floor.  In the moments that follow, appellant walks out of and then back into the view of camera 12.  Bowen is in the middle of the ruckus, but appellant is not engaged in the fight.

{¶ 24} At 2:00:32 a.m., appellant is seen speaking with one of the women he came into the bar with.  Thereafter, appellant moves away from the camera and out of view.  At 2:01:42 a.m., Bowen is depicted on camera 12; his shirt and hat are off, and he is picking up and throwing a chair towards the ruckus.  At the same time, appellant moves back into view on the far side of the screen.  The video footage on camera 12 depicts no fewer than 17 individuals participating in or in close proximity to the ruckus.

{¶ 25} At 2:01:51 a.m., Henderson is depicted on the left front side of camera 12. Appellant is depicted on the center back of the camera's footage.  No one appears to be attacking appellant, although a chair is thrown in his general direction.  At 2:01:54 a.m ., Bowen engages with an unidentified individual.  At 2:01:55 a.m., appellant moves toward Bowen and the unidentified individual. Two frames later, appellant and Bowen are depicted near an exit door, arms swinging.  At the same time, two individuals in the forefront of the screen pick up chairs, while a third individual picks up a table.  At 2:01:58 a.m., Henderson can be seen on the edge of the screen just to the left of Bowen.  The table obscures the camera's view of appellant, Bowen, and Henderson.

{¶ 26} Detective Goodall identified both Bowen and Henderson at 2:01:59 a.m. fully engaged in the ruckus.  Ms. Henderson appears to be bending over and moving away from the ruckus while Bowen remains engaged with two other individuals.  Henderson then stands up and backs away from the commotion.  At 2:02:00 a.m., Henderson puts her left hand up to the left side of her neck.  She then exits the view of camera 12 while Bowen continues to engage in the ruckus. The view of appellant is obscured for four or five frames.  At 2:02:05 a.m., Bowen throws a chair towards appellant and runs out of the view of camera 12. Appellant pushes a few individuals out of the exit door, grabs one of the girls he came in with and exits the bar at 2:02:17 a.m.

{¶ 27} Meanwhile, at 2:02:07 a.m., on camera 3, Henderson is seen walking across the lobby area of the bar towards the bouncer's chair.  Detective Goodall points to what he describes as "discoloration" on her shirt and explains that Henderson appears with her left hand on the left side of her neck, under her long dark hair.  At 2:02:12 a.m., Wells is seen exiting the bar from the main lobby area.  At 2:02:27 a.m., Bowen exits.  A dark circle is visible on his upper left bicep in the area of his stab wound.

{¶ 28} At 2:02:31 a.m., on footage from camera 16, appellant is seen running through the parking lot with a woman, a second woman following close behind. Appellant and both women climb into a pick-up truck, appellant in the passenger seat, and drive towards the entrance to the bar.

{¶ 29} Before the conclusion of Detective Goodall's direct examination, he indicated that to his knowledge, only two individuals received stab wounds during the fight: Henderson and Bowen.  A third individual, Smith, was treated at the hospital for injuries inconsistent with a knife wound.

{¶ 30} On cross examination, Detective Goodall confirmed he did not find a knife associated with appellant nor did he find any blood stained clothes in appellant's possession.

{¶ 31} Detective Goodall also confirmed that when he spoke with Wells on January 15, 2013, Wells did not mention that he saw appellant strike Henderson in the neck.

{¶ 32} A recording of appellant's interview with police was shown to the jury. During the interview, appellant indicated he went to the bar with a few girls and he wasn't there long before the fight broke out.  He denied seeing any weapons other than beer bottles and chairs.  When asked whether he stabbed Henderson, he shook his head "no."

{¶ 33} Following the presentation of evidence, the jury found appellant guilty of murder in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony. Alvarado was found not guilty of felonious assault.  The trial court sentenced Alvarado to 15 years to life in prison.

*State v. Alvarado*, 2015 WL 139519 (Ohio App. 6th Dist. Jan. 9, 2015).

## II.      Procedural History

### A.      State Court Proceedings

#### 1.      Trial Court

The January 2013 session of the Lucas County Grand Jury issued an indictment charging Alvarado with one count of murder in violation of Ohio Rev. Code § 2903.02(B) and 2929.02; and one count of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(2). (Doc. No. 12-1, Exh. 1.)  Alvarado entered a plea of not guilty.  (Doc. No. 12-1, Exh. 2.)

The matter proceeded to jury trial.  On August 23, 2013, the jury found Alvarado guilty of murder, but not guilty of felonious assault or the lesser included offense of aggravated assault.  (Doc. No. 12-2, Exh. 3.)  On September 10, 2013, the trial court sentenced Alvarado to a prison term of 15 years to life.   (Doc. No. 12-1, Exh. 4.)

#### 2.      Direct Appeal

On October 3, 2013, Alvarado, through the same counsel, filed a notice of appeal to the Sixth District Court of Appeals of Ohio ("state appellate court").  (Doc. No. 12-1, Exh. 5.)  In

8

his merit brief, Alvarado raised the following four assignments of error:

     I.     Prosecutorial misconduct occurred in the State's rebuttal closing when the State impermissibly referred to the content of Appellant's character and the Appellant acting in conformity with that character.

     II.     The trial court abused its discretion by not sanctioning State for a discovery violation over the objection of defendant.

     III.     Appellant's conviction was against the manifest weight of the evidence.

     IV.     There was insufficient evidence to sustain Appellant's conviction.

(Doc. No. 12-1, Exh. 6.)  The State filed a brief in opposition.  (Doc. No. 12-1, Exh. 7.)  The state appellate court affirmed Alvardo's conviction and sentence on January 9, 2015.  *State v. Alvarado*, 2015 WL 139519 (Ohio App. 6th Dist. Jan. 9, 2015).

On February 20, 2015, Alvarado, through new counsel, filed a notice of appeal to the Ohio Supreme Court. (Doc. No. 12-1, Exh. 9.)  In his Memorandum in Support of Jurisdiction, Alvarado raised the following five Propositions of Law:

     I.     Defective jury instructions that deprive a defendant of substantive rights constitute plain error as described in Crim. R. 52(B) and may be considered by the reviewing court although the error was not objected at trial.

     II.     When a prosecutor makes impermissible and prejudicial statements in reference to a defendant's character during closing arguments, such comments are improper and prejudicially affect the defendant's constitutional right to a fair trial.

     III.     Defendant is effectively denied his constitutional right to assistance of counsel where counsel's performance is deficient and there is a reasonable probability that counsel's deficient performance prejudiced defendant, depriving him of his due process right to a fair trial.

     IV.     An appellate court has a duty to reverse the conviction and order a new trial where a trial court's verdict is against the manifest weight of the evidence.

9

V.    A judgment may be reversed if the cumulative effect of multiple errors deprives a defendant of his constitutional rights even though, individually, the errors may not rise to the level of prejudicial error or cause for reversal.

(Doc. No. 12-1, Exh. 10.)  The State filed a brief in opposition.  (Doc. No. 12-1, Exh. 11.)  On July 22, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct. Prac. R. 7.08(B)(4).  (Doc. No. 12-1, Exh. 12.)

### 3.    Application to Reopen Appeal

Meanwhile, on April 7, 2015, Alvarado, through counsel, filed an Application to Reopen his Appeal pursuant to Ohio App. R. 26(B).  (Doc. No. 12-1, Exh. 13.)  Alvarado argued appellate counsel was ineffective for failing to raise the following arguments on direct appeal:

I.    Defendant was effectively denied his constitutional right to effective assistance of counsel during trial.

II.   Defective jury instructions deprived Defendant of his right to a fair trial.

III.  Prosecution's impermissible and prejudicial statements during closing arguments denied Defendant his Constitutional Right to a Fair Trial.

IV.   The Cumulative Prejudicial Effect of the Multiple Errors Defendant Suffered During Trial Deprived Him of Constitutional Rights and Warrant Reversal.

(Doc. No. 12-1, Exh. 13.)  The State filed a brief in opposition.  (Doc. No. 12-1, Exh. 14.)   The state appellate court denied Alvarado's Application on June 8, 2015.  (Doc. No. 12-1, Exh. 15.)

On July 17, 2015, Alvarado, through counsel, filed a notice of appeal to the Ohio Supreme Court.  (Doc. No. 12-1, Exh. 16.)  In his Memorandum in Support of Jurisdiction, Alvarado raised the following Propositions of Law:

I.    When reviewing an application to re-open an appeal, the appellate court owes Appellant the right to consider the merits of a claim where it is

10

apparent in the record that there is genuine issue with regard to counsel's effectiveness, in violation of Appellant's constitutionally guaranteed right to the effective assistance of counsel.

II.     When considering an application to re-open an appeal, when presented with genuine issue of with regards to counsel's effectiveness, the appellate court should be required to entertain arguments previously waived as evidence of counsel's alleged ineffectiveness.

(Doc. No.12-1, Exh. 17.)  The State filed a brief in opposition.  (Doc. No. 12-1, Exh. 18.)  On September 30, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).  (Doc. No. 12-1, Exh. 19.)

### 4.     Motion for Leave to File Motion for New Trial

On December 18, 2015, Alvarado, through counsel, filed a Motion for Leave to File a Motion for New Trial in the state trial court.  (Doc. No. 12-1, Exh. 21.)  Therein, Alvarado argued he was entitled to a new trial based on "newly acquired evidence" that supported his claims of innocence, ineffectiveness of trial counsel, and prosecutorial misconduct both before and after trial.  Most notably, Alvarado attached an affidavit dated November 11, 2015 from the State's key witness, Charles Wells, in which Mr. Wells averred, in relevant part, as follows:

3.     The reason I am here is to clear my conscious.  I feel bad.  I was coached by the prosecutor and persuaded to lie on the stand.  I did not know at the time that I would be their only witness and my testimony was material to their case.  Now Hector is serving a life sentence due to my testimony.  I am here today to go on the record and set things straight.

* * *

5.     What happened that night was that we were at the bar, me and a few of my brothers and friends.  A fight jumped off and there was a commotion, ripping, running, and people standing off in the cut.  I seen the fight and I seen my friend the bouncer trying to break the fights up.  After the fight was over, I left the club with my brothers and friends.

6.     I didn't really see nobody with no knife.  When I got outside, all I knew

11

was the police was pulling up.  We were waiting on my friend Dave, the bouncer, to see if he needed a ride.  He told me a girl got stabbed but he didn't need no ride.

7.      A couple of days later, me and my friend Dave was talking and he told me the girl died and it was flashing across the news.  My friend Dave reminded me of who Christina Henderson was.  Dave used to mess around with her mother.  I remember the girl.  I spent a lot of time in the house when she was young, and her mother always treated us like family.  She used to cook for us and stuff.

8.      Everyone was mad, I couldn't believe she was dead.  The family was so upset, I knew I had to help.

9.      Next thing I know, Dave told me a bunch of people had been subpoenaed and a bunch of people had already talked.  Detectives asked if I would come down and talk too.

10.     When I got down there, I already had a case pending.  My house got raided for cocaine, heroin, weed, pills, etc. so I was thinking "what can you do for me?"  When I first talked to the Prosecutor, they ran the screen the showed me the [surveillance] tape.

11.     There was so much commotion, I couldn't really identify the man they wanted me to identify.  The prosecutor pointed him straight out to me and I just rolled with it. The Prosecutor talked him so bad and told me he just got out on felonious assault.  He said "I just want that fucker back in there so bad" and that was when he pointed him out to me.  I did remember seeing Hector, he is noticeable, but I didn't even know who he was and couldn't see him on the video.

12.     Even when the Prosecutor pointed Hector out on video, I didn't see any knife in his hand.  I did see him fighting, but there was a whole lot of people fighting.  There was so much commotion going on I don't think anyone saw who had a knife.

13.     Later, I seen Hector in the parking lot leaving, I still didn't see a knife.

14.     The Prosecutor said "I will do everything I can to make it go away." [it being the pending charges].  After he promised me that he would make everything go away, he disappeared.  I could never get ahold of him and I ended up doing time.

15.     The family was so upset I thought I was doing the right thing. It's been

on my conscious, it's been weighing on me.

* * *

17.    In addition, I want to go on the record and say that [Alvarado's trial counsel] Attorney John Thebes owes me money for a case.  He promised to represent me on a charge in 2012, on CRB-12-01061-0202 and appeared twice on my behalf, but never saw the case through.  The whole trial with Hector, he never acted like we knew each other and never refunded any of my money.

(Doc. No. 12-1, Exh. 21 at Page ID#s409-410.) [1]

In his motion, Alvarado argued "Wells' affidavit shows that the prosecution, in bad faith, failed to disclose material evidence favorable to defendant, violating Alvarado's due process rights and denying him the right to a fair trial."  (*Id*. at Page ID# 387.)  Alvarado also asserted "the prosecution's failure to disclose Wells' prospective deal constitutes a *Giglio* [*v. United States*, 405 U.S. 150 (1972)] claim and *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] error." (*Id*. at Page ID# 389.)  Finally, Alvarado argued "Wells' affidavit, in conjunction with Alvarado's affidavit, shows that Alvarado was effectively denied his constitutional right to assistance of counsel."[2]  (*Id*. at Page ID# 396.)

Also on December 18, 2015, Alvarado filed a Petition for Post-Conviction Relief pursuant to Ohio Rev. Code § 2953.23.  (Doc. No. 12-1, Exh. 22.)  The Petition incorporated by reference Alvarado's Motion for Leave to File Motion for New Trial and supporting affidavits.

---

[1] Alvarado also attached a number of other affidavits in support of his Motion, including his own affidavit, and affidavits from four patrons at the South Beach Bar on the night of Henderson's death stating they never saw Alvarado in possession of a knife.

[2] Among other things, Alvarado argued that "Prior to trial, counsel [John Thebes] was ineffective by failing to disclose that he had previously represented Charles Wells in 2012 and in fact still owes him [i.e., Wells] money from failing to complete his obligations in CRB-12-01061- 0202."  (*Id*. at Page ID# 397.)

13

(*Id*.) The Petition raised the following sole ground for relief:

> I.  Freestanding actual innocence mandating relief under the Federal and Ohio Constitutions.

(*Id*.)  The State moved to dismiss Alvarado's Motion for Leave and Post-Conviction Petition primarily on the grounds they were untimely filed.  (Doc. No. 12-1, Exhs. 23, 24.)

On March 16, 2016, the state trial court denied Alvarado's Motion and Petition on the grounds Alvarado had "failed to establish that he was unavoidably prevented from timely discovering the evidence on which he now relies, and that [Alvarado] has not submitted sufficient evidence of unavoidable delay to merit a hearing on the matter."  (Doc. No. 12-1, Exh. 25.)

On April 14, 2016, Alvarado, through counsel, filed a notice of appeal to the state appellate court.  (Doc. No. 12-1, Exh. 26.)  In his merit brief, Alvarado raised the following grounds for relief:

> I.  The trial court abused its discretion when it denied Mr. Alvarado's motion for leave to file a motion for new trial, without holding a hearing on the issue of whether Mr. Alvarado was unavoidably prevented from discovery of the key witness's recantation.
>
> II.  The trial court erred as a matter of law in denying Mr. Alvarado's petition for post-conviction relief without holding a hearing on the issue of whether Mr. Alvarado was unavoidably prevented from discovery of the key witness's recantation.

(Doc. No. 12-1, Exh. 27.)  The State filed a brief in opposition.  (Doc. No. 12-1, Exh. 28.) Although not part of the habeas record, Alvarado asserts he filed a motion for leave to file *instanter* a reply brief in support of his appellate brief, which was granted.  (Doc. No. 14 at 2.) Alvarado states he filed his reply brief on January 10, 2017.  (*Id*.)

As of the date of this Report & Recommendation, Alvarado's appeal remains pending in

14

the state appellate court.

### B.    Proceedings in this Court

On October 20, 2016, Alvarado filed the instant Petition, raising the following nine

grounds for relief:

I.     The prosecutor violated Petitioner's right to a fair trial by improper and
       prejudicial statements.

II.    The State violated Petitioner's rights to due process and fair trial when it
       suppressed favorable, material evidence.  *Brady v. Maryland*, 373 U.S. 83
       (1963).

III.   The State violated Petitioner's right to due process and fair trial when it
       presented false evidence or allowed it to go uncorrected.

IV.    The evidence against Petitioner is insufficient to sustain his conviction,
       thus violating Petitioner's due process rights under the 14th Amendment.

V.     Petitioner is actually innocent of the crime for which he was convicted,
       and his convictions violate the 14th Amendment.

VI.    The trial court violated Petitioner's rights to due process and fair trial by
       erroneously instructing the jury and relieving the State from its burden of
       proving every element of the offense charged beyond a reasonable doubt.

VII.   Petitioner was denied his constitutional right to assistance of counsel
       provided by the Sixth Amendment.

VIII.  Petitioner was denied his right to effective assistance of appellate counsel.
       U.S. Const. Amends. VI and XIV.

IX.    Petitioner was denied his constitutional right to conflict free counsel when
       his attorney had both represented Petitioner and the State's main witness
       against Petitioner.

(Doc. No. 1.)

Shortly thereafter, on October 28, 2016, Alvarado filed a Motion for Stay and Abeyance.

(Doc. No. 5.)  In his Motion, Alvarado argues his habeas petition is a "mixed petition" because

15

it contains both exhausted and unexhausted claims.  Specifically, he asserts his Second, Third, Fifth, Seventh and Ninth Grounds for Relief are not yet exhausted because they were raised in his Motion for Leave to file Motion for New Trial and Petition for Post-Conviction Relief, both of which are the subject of his pending appeal in the state appellate court.  Alvarado maintains his habeas petition should be stayed because "there is good cause for his failure to exhaust his claims, his claims are potentially meritorious, and he has not intentionally engaged in dilatory tactics."  (*Id.* at 4.)

Respondent filed a cursory opposition to Alvarado's Motion to Stay on November 17, 2016, in which it principally argued the Motion was "premature" because "Respondent cannot address this issue until Respondent receives and reviews the record from the state courts."  (*Id.*)  Additionally, Respondent asserted, without further explanation, that the state trial court's determination that Alvarado's Motion for Leave and Post-Conviction were untimely "would appear to be relevant to the 'good cause' and 'intentionally dilatory litigation tactics' prongs in *Rhines* [*v. Weber*, 544 U.S. 269, 275 (2005)]."  (*Id.*)

On December 27, 2016, Respondent filed its Return of Writ, along with the state court record.  (Doc. No. 12.)  Respondent does not address Alvarado's Motion to Stay in the Return.  Instead, Respondent asserts the habeas grounds that are the subject of Alvarado's Motion (i.e., the Second, Third, Fifth, Seventh and Ninth Grounds for Relief) are procedurally defaulted because the state trial court found them untimely.  Respondent does not discuss or cite any authority regarding the effect of Alvarado's pending state court appeal, either with respect to Alvarado's Motion to Stay or with respect to Respondent's argument these grounds are procedurally defaulted.

16

On January 17, 2017, Alvarado filed a Motion for Order Directing Respondent to Correct the Return of Writ. (Doc. No. 14).  Therein, Alvarado argued Respondent should be ordered to supplement the state court record to include Alvarado's motion to file instanter a reply brief in the state appellate court.  (*Id.*)  Respondent filed a Brief in Opposition (Doc. No. 15), to which Alvarado replied (Doc. No. 16.)

## II.     Legal Standard

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus.  *See* 28 U.S.C. § 2254(b) and (c); *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir. 1991).  If any state procedures for relief remain available, the petitioner has not exhausted his state remedies.  *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all of the petitioner's claims.  *See Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).  A federal district court may not adjudicate a "mixed petition," i.e., one that contains both exhausted and unexhausted claims.  *Rose v. Lundy*, 455 U.S. 509, 518-19 (1982).  Further, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244 , limits the time within which a person in custody pursuant to the judgment of a state court may file a petition for a federal writ of habeas corpus to one year from "the date on which the judgment became final or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1).

In *Rhines v. Weber*, 544 U.S. 269, 275 (2005), the Supreme Court recognized that, "as a result of the interplay between" AEDPA's one-year statute of limitations and the total

exhaustion requirement of *Lundy*, "petitioners who come to federal court with 'mixed' petitions run the risk of forever losing their opportunity for any federal review of their unexhausted claims.  If a petitioner files a timely but mixed petition in federal district court, and the district court dismisses it under *Lundy* after the limitations period has expired, this will likely mean the termination of any federal review."  Accordingly, the Court determined that, in the case of a mixed petition, a district court has the discretion to employ a "stay and abeyance" procedure:

> Under this procedure, rather than dismiss the mixed petition. . . a district court might stay the petition and hold it in abeyance while the petitioner returns to state court to exhaust his previously unexhausted claims. Once the petitioner exhausts his state remedies, the district court will lift the stay and allow the petitioner to proceed in federal court.

*Id.* at 275-76.

The Court cautioned that "stay and abeyance should be available only in limited circumstances," because it "has the potential to undermine . . . AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings." *Id.* at 277.  Accordingly, the Court determined that stay and abeyance is appropriate only where the petitioner can show: (1) good cause for his failure to exhaust; (2) that his unexhausted claims are not "plainly meritless"; and (3) that there is no indication that the petitioner engaged in "intentionally dilatory litigation tactics."  *Id.* at 277-78; *see also Wagner v. Smith*, 581 F.3d 410, 419 (6th Cir. 2009).  Generally, to show good cause for a failure to exhaust state remedies, a petitioner must show why he failed to use available state remedies timely and appropriately. *See Hoffman v. Lazaroff,* 2015 WL 5729578 at * 3 (N.D. Ohio Sept. 28, 2015); *Petkovic v. Clipper*, 2015 WL 3948194 at * 6 (N.D. Ohio June 26, 2015).  Further, in *Rhines*, the Supreme Court opined that a stay should be entered if the unexhausted claim was "potentially

18

meritorious." 544 U.S. at 278.

### III.    Analysis

Under *Rhines*, the first question in evaluating a motion to stay is whether the habeas

petition is a "mixed" petition; i.e., a petition that raises both exhausted and unexhausted claims.

Here, it is uncontested that Alvarado's habeas petition is a "mixed" petition. Moreover, the

Court has conducted its own review and has determined Alvarado's petition contains both

exhausted and unexhausted claims. Alvarado's first ground for relief asserts prosecutorial

misconduct based on three statements made by the State during closing argument. (Doc. No. 1

at 15-18.) Alvarado raised prosecutorial misconduct claims based on two of these statements,

both on direct appeal to the state appellate court and the Ohio Supreme Court. (Doc. No. 12-1

at Exhs. 6, 9.) Respondent does not argue (either in opposition to the Motion to Stay or in the

Return) that these two particular prosecutorial misconduct sub-claims are unexhausted. Thus, at

a minimum, it appears that two of the three subclaims set forth in Ground One are exhausted

claims.

Moreover, it does not appear to be disputed that Alvarado's second, third, fifth, seventh

and ninth grounds for relief are unexhausted. The claims raised in Grounds Two, Three, Seven

and Nine of the instant habeas petition were raised in Alvarado's December 2015 Motion for

Leave to file Motion for New Trial. As set forth *supra*, the state trial court denied Alvarado's

Motion; Alvarado appealed to the state appellate court; and that appeal is still pending as of the

date of this Report & Recommendation. In addition, the actual innocence claim raised in

Alvarado's fifth ground for relief is raised in his state court Petition for Post-Conviction Relief,

which was similarly denied by the state trial court and is currently on appeal to the state

19

appellate court.

Accordingly, the Court finds the instant habeas petition is a "mixed" petition.  Thus, the Court will proceed to consider the remaining *Rhines* factors; i.e., (1) whether Alvarado has shown good cause for his failure to exhaust; (2) whether his unexhausted claims are not "plainly meritless," and (3) whether there is any evidence that Alvarado engaged in "intentionally dilatory litigation tactics."

**A.      Second and Third Grounds for Relief**

In his Second Ground for Relief, Alvarado argues the prosecutor in his case violated *Brady v. Maryland*, 373 U.S. 83 (1964) when he "suppressed the fact that Charles Wells initially could not identify Alvarado, did not see Alvarado with a knife, nor did he see him stab Christina Henderson."  (Doc. No. 1 at 19.)  Alvarado also asserts a *Brady* claim based on the prosecutor's alleged failure to disclose to the defense Wells' prospective deal on pending drug charges.  (*Id.* at 20.)  In his Third Ground for Relief, Alvarado argues the prosecutor violated *Giglio v. United States*, 405 U.S. 150 (1972) by knowingly presenting false testimony; i.e., Wells' trial testimony.  (*Id*. at 24.)  Alvarado first presented these grounds in his December 2015 Motion for Leave to file Motion for New Trial and Petition for Post-Conviction Relief, the denial of which is currently on appeal to the state appellate court.

In his Motion for Stay and Abeyance, Alvarado argues there is "good cause" for his failure to exhaust these grounds prior to filing his habeas petition.  He claims he "had no previous knowledge of the claims that he now seeks to exhaust" because they "in large part arise from Charles Wells' [November 2015] recantation, which was not made until more than two years after Alvarado's conviction and nearly a month after the conclusion of Alvarado's

direct review in state court." (Doc. No. 5 at 6.) Alvarado asserts he "was prevented from

discovering Wells' recantation sooner– and thus also raising the claims that stem from it– due to

the prosecution's misconduct." (*Id.*) He also claims he was prevented from discovering these

unexhausted claims due to the ineffectiveness of his trial counsel, who allegedly failed to

adequately investigate the case and did not speak to Wells prior to trial. (*Id*. at 7.) In sum,

Alvarado argues he "was prevented from discovering the factual bases for his unexhausted

grounds for relief as a result of prosecutorial misconduct, ineffective assistance of counsel, and

Wells' initial unwillingness to tell the truth, and thus could not fully exhaust those claims prior

to the expiration of the AEDPA statute of limitations." (*Id.* at 8.)

Respondent does not meaningfully oppose Alvarado's arguments. Respondent's

opposition to Alvarado's Motion to Stay is four paragraphs in length, half of which is devoted

to arguing the Motion is premature. Respondent's only mention of the *Rhines* factors (either in

his opposition to the Motion to Stay or in the Return) is his brief statement that the trial court's

denial of Alvarado's motion for leave and post-conviction petition as untimely "would appear to

relevant to the 'good cause' and 'intentionally dilatory litigation tactics' prongs in *Rhines*."

(Doc. No. 9 at 2.)

The Court finds Alvarado has established "good cause" for failing to exhaust his Second

and Third Grounds for Relief.  As Alvarado correctly notes, these Grounds are based

principally on Charles Wells' recantation affidavit, which was not obtained until November

2015.  While the state trial court has determined Alvarado failed to establish he was

"unavoidably prevented from timely discovering" this evidence, Alvarado strongly disputes this

determination and the issue is squarely before the state appellate court.  It is possible that either

the state appellate court (or, if further appealed, the Ohio Supreme Court) might come to a different conclusion.  Under the circumstances, the Court is not willing to find that Alvarado cannot establish "good cause" under *Rhines* solely because the state trial court determined Alvarado's new trial motion and post-conviction petition were untimely under state law. Accordingly, and because Alvarado's Second and Third Grounds for Relief stem from Charles Wells' willingness to recant his trial testimony (a circumstance which was outside of Alvarado's control), the Court finds Alvarado has demonstrated "good cause" for having failed to exhaust these grounds for relief.

Further, the Court finds Alvarado's Second and Third Grounds for Relief are not "plainly meritless," i.e., they are potentially meritorious.  It is well established that a claim under *Brady* and its progeny contains three parts: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Similarly, in order to establish a *Giglio* violation, a petitioner must demonstrate that a witness's statement was false; the statement was material; and the prosecution knew it was false.  *See Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998); *Rosencratz v. Lafler*, 568 F.3d 577, 583-584 (6th Cir. 2009).

Here, in his affidavit, Wells avers he was "coached by the prosecutor and persuaded to lie on the stand."  (Doc. No. 12-1, Exh. 21 at Page ID#s 409-410.)  He states that, while he was inside the bar during the fight, he "didn't really see nobody with a knife" and that, when he saw

22

Alvarado "in the parking lot leaving [the bar], I still didn't see a knife."[3]  (*Id.*)  Wells'

statements in his recantation affidavit are directly contradictory to his trial testimony in several

important respects.  As the state appellate court explained:

> The only "eye witness" to come forward was Wells, a convicted felon who had
> been acquainted with the victims but had never met appellant.  Wells testified that
> he saw appellant swing on several people and they quickly got out of his way.  He
> saw appellant strike Henderson in the neck while holding "an object" in his hand
> and then saw Henderson retreat, holding her neck.  Wells further testified that he
> saw appellant leave the bar with a knife in his left hand.  While grainy video
> surveillance footage showed appellant in Henderson's vicinity, a raised table was
> blocking the view of the camera at the moment of the fatal blow.  Thus, the case
> largely turned on the testimony of Wells, and the jury had the primary
> responsibility for determining his credibility.

*State v. Alvarado*, 2015 WL 139519 at * 9.  The Court acknowledges that recantation affidavits

are viewed with skepticism.  *See e.g. Carter v. Mitchell*, 443 F.3d 517, 519 (6th Cir. 2006); *Byrd*

*v. Collins*, 209 F.3d 486, 508 n 16 (6th Cir. 2000).  However, given that Wells was the key witness

against Alvarado and "the case largely turned on [Wells'] testimony," the Court cannot say, at

this stage of the proceedings, that Alvarado's Second and Third Grounds for Relief are "plainly

meritless."

Lastly, the Court finds there is no evidence that Alvarado has engaged in intentionally

dilatory litigation tactics.  Wells executed his recantation affidavit in November 2015, and

Alvarado promptly filed his Motion for Leave to file New Trial Motion and Petition for Post-

Conviction Relief the following month.  Accordingly, with respect to Alvarado's Second and

Third Grounds for Relief, Alvarado has satisfied the *Rhines* standard for a stay and abeyance in

this case.

---

[3] Wells also suggests that the prosecutor "promised to make [drug charges pending against
him] go away" in exchange for his testimony against Alvarado.  (*Id.*)

23

**B.**     **Seventh and Ninth Grounds for Relief**

In his Seventh and Ninth Grounds for Relief, Alvarado asserts ineffectiveness of trial counsel based on (among other things) trial counsel's alleged failure to investigate and conflict of interest with respect to Charles Wells.  Specifically, Alvarado argues:

> Despite the State's providing Wells' police statements in discovery, [defense counsel] Thebes apparently did not interview him.  Thebes had adequate time to reach out to Wells but never did, perhaps given their history.  Thebes had represented Wells in 2012 and according to Wells, still owes him a refund for failing to complete his attorney obligations that case. (Wells Aff. ¶ 17); See; CRB-12-01061-0202.  During trial, he further failed to remedy his lack of preparation by not asking for an extension upon realizing that he was not adequately prepared.  (Alvarado Aff. ¶ 22).  Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 671.  There was no reasonable investigation, nor was there a reasonable decision to forgo investigation.
>
> Moreover, Alvarado was denied the effective assistance of counsel because of an attorney conflict based on his lawyer's prior representation of Wells, a critical prosecution witness.  Because Thebes had represented both Wells and Alvarado, he was put in the untenable position of helping Alvarado by violating his duty of loyalty to his previous client, Wells.  Moreover, it is not even clear whether Wells could be considered a previous client, as opposed to a current client.  According to Wells, Thebes "appeared twice on [his] behalf, but never saw the case through."  (Wells Aff. ¶ 17).
>
> Alvarado had no knowledge that Thebes ever represented the State's key witness against him.  (Alvarado Aff. ¶ 28).  "If I had known of their history, I would have fired John Thebes immediately and retained substitute counsel.) (Alvarado Aff. ¶29).  Alvarado continued with Thebes as his attorney after trial in order to prosecute the appeal of his conviction.  It was not until after Thebes' representation of Alvarado concluded that Wells was finally interviewed and the truth was discovered.
>
> Through no fault of Alvarado's, the exonerating information in Wells' affidavit was not shared with the defense prior to November 2015.  When Alvarado filed for a new trial, based upon Wells' affidavit, the trial court held it against Alvarado for failing to obtain the information earlier.   Alvarado relied on his counsel, and if there was any chance that Wells would have provided this exonerating information earlier, then it is counsel's fault for failing to get it.

24

(Doc. No. 1 at 42-43.) Alvarado first presented these grounds in his December 2015 Motion for Leave to file Motion for New Trial and Petition for Post-Conviction Relief, the denial of which is currently on appeal to the state appellate court.

For the same reasons set forth in connection with Alvarado's Second and Third Grounds for Relief, the Court finds Alvarado can demonstrate "good cause" for failing to exhaust his Seventh and Ninth Grounds for Relief prior to filing his habeas petition. Like his Second and Third Grounds, Alvarado's ineffective assistance claims relating to defense counsel's failure to investigate and alleged conflict of interest stem largely from Wells' recantation affidavit, which was not executed until November 2015. As noted above, although the state trial court determined Alvarado had "failed to establish that he was unavoidably prevented from timely discovering" this evidence, the state appellate court may come to a different conclusion.

The Court further finds Alvarado's ineffective assistance claims relating to failure to investigate and conflict of interest are not "plainly meritless." To show ineffective assistance of counsel, a convicted party must establish both "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for that deficiency, the outcome of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Based on Wells' and Alvarado's affidavits, and in light of the fact the case "largely turned on [Wells'] testimony," the Court cannot say at this stage of the proceedings that Alvarado's Seventh and Ninth Grounds for Relief are "plainly meritless."

Finally, and for the same reasons set forth in connection with Alvarado's Second and Third Grounds for Relief, the Court finds there is no evidence that Alvarado has engaged in

intentionally dilatory litigation tactics.  Accordingly, with respect to Alvarado's Seventh and Ninth Grounds for Relief, Alvarado has satisfied the *Rhines* standard for a stay and abeyance in this case.

**C.      Fifth Ground for Relief**

In his Fifth Ground for Relief, Alvarado asserts he is actually innocent.  The Sixth Circuit, however, has repeatedly held that actual innocence is not cognizable as a free-standing habeas claim, particularly in the context of non-capital proceedings.  *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007).  *See also Thomas v. Perry*, 553 Fed. Appx. 485, 486 (6th Cir. Jan. 15, 2014) ("Thomas' freestanding claim of actual innocence based on newly discovered evidence is not cognizable on federal habeas review"); *Sitto v. Lafler*, 2008 WL 2224862 at * 1 (6th Cir. May 28, 2008) ("[W]e continue to adhere to the rule that a free-standing innocence claim is not cognizable for habeas review"); *Wright v. Stegall*, 2007 WL 2566047 at * 3 (6th Cir. 2007) ("Since the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside the death-penalty context, this court finds that petitioner's claim is not entitled to relief under available Supreme Court precedent."); *Hoop v. Jackson*, 2015 WL 6735895 at * 22 (S.D. Ohio Nov. 4, 2015) ("Case law in the Sixth Circuit establishes that the Supreme Court of the United States has never recognized a free-standing or substantive actual innocence claim."); *Carter v. Bradshaw*, 2015 WL 5752139 at * 51 (N.D. Ohio Sept. 30, 2015) (Pearson, J.); *Keenan v. Bagley*, 2012 WL 1424751 at fn 28 (N.D. Ohio April 24, 2012) (Katz, J.); *Johnson v. Kelly*, 2015 WL 1298711 at * 11 (N.D. Ohio March 23, 2015) (Zouhary, J., adopting report and recommendation of Baughman, M.J.)

26

Given, however, that Alvarado satisfies the *Rhines* standard for a stay and abeyance with respect to his Second, Third, Seventh and Ninth Grounds for Relief, this Court should nevertheless grant the motion for a stay and abeyance in this case.

## IV.    Conclusion

Accordingly, and for all the reasons set forth above, it is recommended that Alvarado's Motion for Stay and Abeyance (Doc. No. 5) be GRANTED.  It is further recommended that the stay be granted on the condition that Alvarado (1) file quarterly status reports in this Court regarding the progress of his state court appeal; and (2) seek reinstatement on this Court's active docket within thirty (30) days of fully exhausting his state court remedies.

In light of this recommendation, it is further recommended that Alvarado's Motion for Order Directing Respondent to Correct the Return (Doc. No. 14) be DENIED WITHOUT PREJUDICE subject to refiling once Alvarado fully exhausts his state court remedies and this matter is reinstated to the Court's active docket.

**IT IS SO ORDERED.**


Date:   February 7, 2017                              *s/ Jonathan D. Greenberg*
                                                     Jonathan D. Greenberg
                                                     United States Magistrate Judge


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**