# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| HECTOR ALVARADO, | ) | CASE NO. 3:16-CV-2563 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE PATRICIA GAUGHAN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| WARDEN, | ) | JONATHAN D. GREENBERG |
| Ohio State Penitentiary, | ) | |
| | ) | ORDER |
| Respondent. | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2. Before the Court is the Petition of Hector Alvarado ("Alvarado" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. Currently pending are Alvarado's (1) Motion for Discovery (Doc. No. 28); and (2) Motion to Expand/Complete the Record (Doc. No. 29.) Respondent filed briefs in opposition to both Motions, to which Alvarado replied.

For the following reasons, Alvarado's Motion for Discovery (Doc. No. 28) is GRANTED IN PART and DENIED IN PART. Alvarado's Motion to Expand/Complete the Record (Doc. No. 29) is GRANTED.

## I.    Summary of Facts

Alvarado's habeas petition challenges the constitutionality of his conviction and sentence for murder in the case of *State v. Alvarado*, Lucas County Court of Common Pleas Case No. G-4801-CR-201301381. The state appellate court summarized the facts underlying Alvarado's conviction as follows:

{¶ 2} In the early morning hours of New Year's Day, 2013, a fight broke out at

the South Beach Bar on Alexis Road in Toledo, Lucas County, Ohio. Christine Henderson suffered a fatal wound to her neck and her fiancée, Stacy Bowen, suffered a non-fatal laceration to his upper arm. Appellant, Hector Alvarado, was indicted on one count of murder in violation of R.C. 2903.02(B) and R.C. 2929.02, and one count of felonious assault in violation of R.C. 2903.11(A)(2). The case proceeded to trial by jury. The following is a summary of the evidence presented.

{¶ 3} Megan Gibson, an employee at the South Beach Bar and Grill, testified that she was working the door in the early morning hours of New Year's Day 2013 when "the bar broke out into a riot." She did not witness the assault on Bowen or Henderson. She did, however, clean-up a large amount of blood in the area Henderson was standing before she walked outside and died in the bar's parking lot.

{¶ 4} A bar patron, Charles Wells, testified that he and three of his friends were on the bar's back patio "smoking weed and drinking beer" when the violent, yet short-lived, fight began. He entered the bar, but never engaged in the fighting. Instead, he stood back and observed the commotion, keeping his eye on appellant because he was "the biggest guy in the bar."

{¶ 5} Wells explained that during the fight appellant had "an object" in his hand. He observed appellant swing the object and noted that "everybody he swung on hurried up and got away from him." Wells admitted that his view was obstructed at times because "bodies was [sic] moving, chairs was [sic] flying, people was [sic] swinging."

{¶ 6} At one point, Wells observed appellant near Henderson. He explained, "I seen him swing on her and she walk [sic] away, she grabbed her neck and walk [sic] away.  But I didn't know what had happened right then and there." Wells explained that appellant had the object in his hand when he "swung on" Henderson.

{¶ 7} Before the fight completely subsided, Wells and his friends left the bar through the front door. Wells explained what he observed when he stepped outside:

> A:    All I seen was cars, but I immediately spinned around because it was a crowd of people coming out, there was some people coming out, so then when I seen who was coming out, I turned around and started walking backwards and tripped off the curve.

> Q:    Did you see [appellant]?

A:      He came out right behind me.

Q:      What did you see him with?

A:      I seen him with a Mexican girl in one hand. I seen him with a knife in another hand.

Q:      Sure it was a knife?

A:      Clearly I seen the knife. I wouldn't turn my back to him because I just seen him get into it with all these black people and I didn't want him to stab me too. I had my brother and them in the car. They made it in the car. I was walking backwards and my brother and them kept saying, Chuck, get in the car; Chuck, get in the car. I said fuck that. I'm watching him. He got a knife.

Q:      How long did you watch him?

A:      All the way until I got in the car.

{¶ 8} Wells explained that he and his friends came back to the bar later that morning so they could give another friend, a bouncer, a ride home. It was then that he heard Henderson had died and that Bowen had killed her with a bottle. He explained, "I said, hell, no, [appellant] did it."

{¶ 9} Wells did not talk to the police in the early morning hours of New Year's Day 2013. He did, however, receive a phone call from Detective Goodlet on January 8, 2013. He told the detective what he saw and agreed to come down to the station and give a recorded statement. He explained,

A:      * * * And the only reason why I really, really went down there, because like I say, I know the family and they was saying the girlfriend's boyfriend was the one that stabbed her with a bottle and I said, hell no, huh-uh, no. And then I called my friend Dave which [sic] was the bouncer there that night and he asked me was I going down there and I said I'm going to go down there and talk to him.

Q:      Did you ever voluntarily talk to the police before?

A:      Never in my life. Where I come from that's a snitch.

{¶ 10} Wells was able to identify himself on surveillance video and various still

photos taken from the video. On cross examination, Wells testified that he and Bowen were not "friends" but that he knew Bowen from the neighborhood and had played basketball with him. He also admitted that he knew Henderson because she drove a recognizable vehicle, a "hot pink truck * * * with cartoon characters on it."

{¶ 11} Dr. Diane Scala–Barnet, a deputy coroner for Lucas County, performed an autopsy on Henderson. She classified Henderson's death as a homicide and determined that a stab wound to the left side of her neck caused a complete transection of the carotid artery. In her opinion, the fatal wound was caused by an instrument with one sharp edge and one dull edge. She ruled out any suggestion that a broken bottle could have caused the wound.

{¶ 12} Dr. Scala–Barnet described the wound track as "lateral to medial and downward." In her opinion, Henderson likely received the wound from a frontal attack but she could not rule out the possibility that the wound was received from an assailant standing behind her. When asked whether it was possible for Henderson to have received the wound while bent over, Dr. Scala–Barnet stated, "[t]hat would be harder to get the downward trajectory * * * It's not impossible, but it's harder to get in there." Dr. Scala–Barnet agreed that if Henderson did receive the wound while bent over, "the assailant would almost certainly have to be lower than her." However, she added that it all depended on where the assailant was positioned relative to the Henderson's body.

{¶ 13} Dr. Scala–Barnet indicated that immediately after being stabbed, blood would have started spurting from Henderson's wound and death would have occurred within a matter of minutes. She indicated that Henderson would have been able to walk after being stabbed, but that she would have felt light headed very quickly.

{¶ 14} Bowen testified that he became involved in the melee after he noticed several of his male friends fighting with people he had never seen before. He didn't know why the fight started and indicated he had no success in trying to break things up. He did not recall fighting with appellant.

{¶ 15} Bowen identified himself, Henderson, and appellant on surveillance footage taken at the bar during the fight. He did not see appellant stab Henderson but he recalled—and the surveillance footage corroborated—that the three of them were in close proximity to each other in the moments before Henderson grabbed her neck and walked away from the melee. However, a table lifted-up and thrown during the fight, obscured the camera at the exact moment Henderson likely received the fatal stab wound to her neck.

{¶ 16} Detective William Goodlet of the Toledo Police Department testified that

he interviewed Bowen shortly after the fight. While Bowen admitted to participating in the fight, he was unable to identify anyone he was fighting.

{¶ 17} Detective Goodlet went to a local hospital after receiving information that another potential witness, Basilia Smith, was being treated for injuries she received during the fight. When questioned, Smith admitted to being at the bar and receiving injuries during the melee. However, she was too intoxicated to provide any additional information helpful to the detective's investigation.

{¶ 18} A few hours after he interviewed Smith, Detective Goodlet received surveillance video from the bar's numerous interior and exterior cameras. The time frame of the preliminary video spanned from 1:39:00 a.m. through 2:15:00 a.m. The detective and his team watched the video in real time but found it grainy and "really tough to follow." Detective Goodlet and his team of investigating officers made a determination to start analyzing footage of the back lot where Henderson's body was found and work back in time in an effort to determine where and when she was injured. At the time, they knew the identities of very few people in the bar. During this period of the investigation, appellant's identity was unknown, but he was one of several "persons of interest" because of his proximity to the victims during the melee.

{¶ 19} A short time later, Detective Goodlet obtained additional surveillance video. After the Detective and his team watched the additional footage, they invited Bowen back in to the station and showed him still shots of the footage. Bowen was able to identify himself, but was not able to identify any of the suspects.

{¶ 20} About a week after the incident, Detective Goodlet received a call from one of the men who had been working security inside the bar. Based upon that conversation, Detective Goodlet made contact with Wells. Detective Goodlet described his first phone conversation with Wells, as follows:

> He told me what he had seen, where he was at, he stated he was at the bar with his brother. He's—he's having a good time. There's somebody yelling, security, security, security. He comes out, sees just fighting. People fighting everywhere. He states he runs out of the bar and while he's outside the bar, he sees a large Hispanic male come out of the bar. He's got a girl in his right hand and he's got a knife in his left hand. He said he saw this Hispanic male run, run from the scene, and he said that's the guy, he did it.

A week later Wells came down to the station. During a recorded interview, but after Wells identified a "big Mexican with tattoos on his head," Detective Goodlet showed Wells still shots from the surveillance video. Wells was able to

point out the appellant.

{¶ 21} At trial, Detective Goodlet indicated that the majority of Wells' recorded statement was consistent with Wells' testimony in court, with one exception; during the recorded interview, Wells did not indicate that "he observed [appellant] punching or making some striking movement at Miss Henderson."

{¶ 22} Video footage from outside the bar demonstrated that appellant arrived at 12:46 a.m. with three women.  A few moments later, video footage from inside the bar depicted the three women walking past the bouncer without being patted down.  Detective Goodall testified that the video showed appellant entering the bar after being given a "cursory pat down * * * at best."  Detective Goodall pointed out that the bouncer did not pat appellant down towards his ankles or around his back.

{¶ 23} Video footage demonstrates that appellant was on the bar's back patio until approximately 1:55 a.m.  At that time, appellant moved into the view of camera 3, inside the bar.  At 1:55:58 a.m., appellant is seen on footage from camera 3 and camera 12, seated, taking a brief phone call.  There is no sign of any fighting.  At 1:59:29 a.m., appellant abruptly stands up.  At the same time, camera 11 depicts a fight on the dance floor.  In the moments that follow, appellant walks out of and then back into the view of camera 12.  Bowen is in the middle of the ruckus, but appellant is not engaged in the fight.

{¶ 24} At 2:00:32 a.m., appellant is seen speaking with one of the women he came into the bar with.  Thereafter, appellant moves away from the camera and out of view.  At 2:01:42 a.m., Bowen is depicted on camera 12; his shirt and hat are off, and he is picking up and throwing a chair towards the ruckus.  At the same time, appellant moves back into view on the far side of the screen.  The video footage on camera 12 depicts no fewer than 17 individuals participating in or in close proximity to the ruckus.

{¶ 25} At 2:01:51 a.m., Henderson is depicted on the left front side of camera 12. Appellant is depicted on the center back of the camera's footage.  No one appears to be attacking appellant, although a chair is thrown in his general direction.  At 2:01:54 a.m ., Bowen engages with an unidentified individual.  At 2:01:55 a.m., appellant moves toward Bowen and the unidentified individual.  Two frames later, appellant and Bowen are depicted near an exit door, arms swinging.  At the same time, two individuals in the forefront of the screen pick up chairs, while a third individual picks up a table.  At 2:01:58 a.m., Henderson can be seen on the edge of the screen just to the left of Bowen.  The table obscures the camera's view of appellant, Bowen, and Henderson.

{¶ 26} Detective Goodall identified both Bowen and Henderson at 2:01:59 a.m.

fully engaged in the ruckus. Ms. Henderson appears to be bending over and moving away from the ruckus while Bowen remains engaged with two other individuals. Henderson then stands up and backs away from the commotion. At 2:02:00 a.m., Henderson puts her left hand up to the left side of her neck. She then exits the view of camera 12 while Bowen continues to engage in the ruckus. The view of appellant is obscured for four or five frames. At 2:02:05 a.m., Bowen throws a chair towards appellant and runs out of the view of camera 12. Appellant pushes a few individuals out of the exit door, grabs one of the girls he came in with and exits the bar at 2:02:17 a.m.

{¶ 27} Meanwhile, at 2:02:07 a.m., on camera 3, Henderson is seen walking across the lobby area of the bar towards the bouncer's chair. Detective Goodall points to what he describes as "discoloration" on her shirt and explains that Henderson appears with her left hand on the left side of her neck, under her long dark hair. At 2:02:12 a.m., Wells is seen exiting the bar from the main lobby area. At 2:02:27 a.m., Bowen exits. A dark circle is visible on his upper left bicep in the area of his stab wound.

{¶ 28} At 2:02:31 a.m., on footage from camera 16, appellant is seen running through the parking lot with a woman, a second woman following close behind. Appellant and both women climb into a pick-up truck, appellant in the passenger seat, and drive towards the entrance to the bar.

{¶ 29} Before the conclusion of Detective Goodall's direct examination, he indicated that to his knowledge, only two individuals received stab wounds during the fight: Henderson and Bowen. A third individual, Smith, was treated at the hospital for injuries inconsistent with a knife wound.

{¶ 30} On cross examination, Detective Goodall confirmed he did not find a knife associated with appellant nor did he find any blood stained clothes in appellant's possession.

{¶ 31} Detective Goodall also confirmed that when he spoke with Wells on January 15, 2013, Wells did not mention that he saw appellant strike Henderson in the neck.

{¶ 32} A recording of appellant's interview with police was shown to the jury. During the interview, appellant indicated he went to the bar with a few girls and he wasn't there long before the fight broke out. He denied seeing any weapons other than beer bottles and chairs. When asked whether he stabbed Henderson, he shook his head "no."

{¶ 33} Following the presentation of evidence, the jury found appellant guilty of murder in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony.

> Alvarado was found not guilty of felonious assault. The trial court sentenced
> Alvarado to 15 years to life in prison.

*State v. Alvarado*, 2015 WL 139519 (Ohio App. 6th Dist. Jan. 9, 2015).

## II.     Procedural History

### A.     State Court Proceedings

#### 1.     Trial Court

The January 2013 session of the Lucas County Grand Jury issued an indictment

charging Alvarado with one count of murder in violation of Ohio Rev. Code § 2903.02(B) and

2929.02; and one count of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(2).

(Doc. No. 12-1, Exh. 1.)  Alvarado entered a plea of not guilty.  (Doc. No. 12-1, Exh. 2.)

The matter proceeded to jury trial.  On August 23, 2013, the jury found Alvarado guilty

of murder, but not guilty of felonious assault or the lesser included offense of aggravated

assault.  (Doc. No. 12-1, Exh. 3.)  On September 10, 2013, the trial court sentenced Alvarado to

a prison term of 15 years to life.   (Doc. No. 12-1, Exh. 4.)

#### 2.     Direct Appeal

On October 3, 2013, Alvarado, through the same counsel, filed a notice of appeal to the

Sixth District Court of Appeals of Ohio ("state appellate court").  (Doc. No. 12-1, Exh. 5.)  In

his merit brief, Alvarado raised the following four assignments of error:

I.      Prosecutorial misconduct occurred in the State's rebuttal closing when the
        State impermissibly referred to the content of Appellant's character and
        the Appellant acting in conformity with that character.

II.     The trial court abused its discretion by not sanctioning State for a
        discovery violation over the objection of defendant.

III.    Appellant's conviction was against the manifest weight of the evidence.

IV.     There was insufficient evidence to sustain Appellant's conviction.

(Doc. No. 12-1, Exh. 6.)  The State filed a brief in opposition.  (Doc. No. 12-1, Exh. 7.)  The

state appellate court affirmed Alvardo's conviction and sentence on January 9, 2015.  *State v.*

*Alvarado*, 2015 WL 139519 (Ohio App. 6th Dist. Jan. 9, 2015).

On February 20, 2015, Alvarado, through new counsel, filed a notice of appeal to the

Ohio Supreme Court. (Doc. No. 12-1, Exh. 9.)  In his Memorandum in Support of Jurisdiction,

Alvarado raised the following five Propositions of Law:

> I.      Defective jury instructions that deprive a defendant of substantive rights
> constitute plain error as described in Crim. R. 52(B) and may be
> considered by the reviewing court although the error was not objected at
> trial.
>
> II.     When a prosecutor makes impermissible and prejudicial statements in
> reference to a defendant's character during closing arguments, such
> comments are improper and prejudicially affect the defendant's
> constitutional right to a fair trial.
>
> III.    Defendant is effectively denied his constitutional right to assistance of
> counsel where counsel's performance is deficient and there is a reasonable
> probability that counsel's deficient performance prejudiced defendant,
> depriving him of his due process right to a fair trial.
>
> IV.     An appellate court has a duty to reverse the conviction and order a new
> trial where a trial court's verdict is against the manifest weight of the
> evidence.
>
> V.      A judgment may be reversed if the cumulative effect of multiple errors
> deprives a defendant of his constitutional rights even though, individually,
> the errors may not rise to the level of prejudicial error or cause for
> reversal.

(Doc. No. 12-1, Exh. 10.)  The State filed a brief in opposition.  (Doc. No. 12-1, Exh. 11.)  On

July 22, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to

S.Ct. Prac. R. 7.08(B)(4).  (Doc. No. 12-1, Exh. 12.)

### 3.    Application to Reopen Appeal

Meanwhile, on April 7, 2015, Alvarado, through counsel, filed an Application to Reopen his Appeal pursuant to Ohio App. R. 26(B).  (Doc. No. 12-1, Exh. 13.)  Alvarado argued appellate counsel was ineffective for failing to raise the following arguments on direct appeal:

I.    Defendant was effectively denied his constitutional right to effective assistance of counsel during trial.

II.    Defective jury instructions deprived Defendant of his right to a fair trial.

III.    Prosecution's impermissible and prejudicial statements during closing arguments denied Defendant his Constitutional Right to a Fair Trial.

IV.    The Cumulative Prejudicial Effect of the Multiple Errors Defendant Suffered During Trial Deprived Him of Constitutional Rights and Warrant Reversal.

(Doc. No. 12-1, Exh. 13.)  The State filed a brief in opposition.  (Doc. No. 12-1, Exh. 14.)  The state appellate court denied Alvarado's Application on June 8, 2015 on the merits.  (Doc. No. 12-1, Exh. 15.)

On July 17, 2015, Alvarado, through counsel, filed a notice of appeal to the Ohio Supreme Court.  (Doc. No. 12-1, Exh. 16.)  In his Memorandum in Support of Jurisdiction, Alvarado raised the following Propositions of Law:

I.    When reviewing an application to re-open an appeal, the appellate court owes Appellant the right to consider the merits of a claim where it is apparent in the record that there is genuine issue with regard to counsel's effectiveness, in violation of Appellant's constitutionally guaranteed right to the effective assistance of counsel.

II.    When considering an application to re-open an appeal, when presented with genuine issue of with regards to counsel's effectiveness, the appellate court should be required to entertain arguments previously waived as evidence of counsel's alleged ineffectiveness.

(Doc. No.12-1, Exh. 17.)  The State filed a brief in opposition.  (Doc. No. 12-1, Exh. 18.)  On September 30, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).  (Doc. No. 12-1, Exh. 19.)

### 4.      Motion for Leave to File Motion for New Trial

On December 18, 2015, Alvarado, through counsel, filed a Motion for Leave to File a Motion for New Trial in the state trial court.  (Doc. No. 12-1, Exh. 21.)  Therein, Alvarado argued he was entitled to a new trial based on newly acquired evidence that supported his claims of innocence, ineffectiveness of trial counsel, and prosecutorial misconduct both before and after trial.  Most notably, Alvarado attached an affidavit dated November 11, 2015 from the State's key witness, Charles Wells, in which Mr. Wells averred, in relevant part, as follows:

> 3.      The reason I am here is to clear my conscious.  I feel bad.  I was coached by the prosecutor and persuaded to lie on the stand.  I did not know at the time that I would be their only witness and my testimony was material to their case.  Now Hector is serving a life sentence due to my testimony.  I am here today to go on the record and set things straight.
>
> * * *
>
> 5.      What happened that night was that we were at the bar, me and a few of my brothers and friends.  A fight jumped off and there was a commotion, ripping, running, and people standing off in the cut.  I seen the fight and I seen my friend the bouncer trying to break the fights up.  After the fight was over, I left the club with my brothers and friends.
>
> 6.      I didn't really see nobody with no knife.  When I got outside, all I knew was the police was pulling up.  We were waiting on my friend Dave, the bouncer, to see if he needed a ride.  He told me a girl got stabbed but he didn't need no ride.
>
> 7.      A couple of days later, me and my friend Dave was talking and he told me the girl died and it was flashing across the news.  My friend Dave reminded me of who Christina Henderson was.  Dave used to mess around with her mother.  I remember the girl.  I spent a lot of time in the house when she was young, and her mother always treated us like family.

She used to cook for us and stuff.

8.    Everyone was mad, I couldn't believe she was dead.  The family was so
      upset, I knew I had to help.

9.    Next thing I know, Dave told me a bunch of people had been subpoenaed
      and a bunch of people had already talked.  Detectives asked if I would
      come down and talk too.

10.   When I got down there, I already had a case pending.  My house got
      raided for cocaine, heroin, weed, pills, etc. so I was thinking "what can
      you do for me?"  When I first talked to the Prosecutor, they ran the
      screen the showed me the [surveillance] tape.

11.   There was so much commotion, I couldn't really identify the man they
      wanted me to identify.  The prosecutor pointed him straight out to me and
      I just rolled with it. The Prosecutor talked him so bad and told me he just
      got out on felonious assault.  He said "I just want that fucker back in
      there so bad" and that was when he pointed him out to me.  I did
      remember seeing Hector, he is noticeable, but I didn't even know who he
      was and couldn't see him on the video.

12.   Even when the Prosecutor pointed Hector out on video, I didn't see any
      knife in his hand.  I did see him fighting, but there was a whole lot of
      people fighting.  There was so much commotion going on I don't think
      anyone saw who had a knife.

13.   Later, I seen Hector in the parking lot leaving, I still didn't see a knife.

14.   The Prosecutor said "I will do everything I can to make it go away." [it
      being the pending charges].  After he promised me that he would make
      everything go away, he disappeared.  I could never get ahold of him and I
      ended up doing time.

15.   The family was so upset I thought I was doing the right thing. It's been
      on my conscious, it's been weighing on me.

             * * *

17.   In addition, I want to go on the record and say that [Alvarado's trial
      counsel] Attorney John Thebes owes me money for a case.  He promised
      to represent me on a charge in 2012, on CRB-12-01061-0202 and
      appeared twice on my behalf, but never saw the case through.  The whole
      trial with Hector, he never acted like we knew each other and never

refunded any of my money.

(Doc. No. 12-1, Exh. 21 at Page ID#s409-410.) [1]

In his motion, Alvarado argued "Wells' affidavit shows that the prosecution, in bad faith, failed to disclose material evidence favorable to defendant, violating Alvarado's due process rights and denying him the right to a fair trial." (*Id*. at Page ID# 387.) Alvarado also asserted "the prosecution's failure to disclose Wells' prospective deal constitutes a *Giglio* [*v. United States*, 405 U.S. 150 (1972)] claim and *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] error." (*Id*. at Page ID# 389.) Finally, Alvarado argued "Wells' affidavit, in conjunction with Alvarado's affidavit, shows that Alvarado was effectively denied his constitutional right to assistance of counsel."[2] (*Id*. at Page ID# 396.)

Also on December 18, 2015, Alvarado filed a Petition for Post-Conviction Relief pursuant to Ohio Rev. Code § 2953.23. (Doc. No. 12-1, Exh. 22.) The Petition incorporated by reference Alvarado's Motion for Leave to File Motion for New Trial and supporting affidavits. (*Id*.) The Petition raised the following sole ground for relief:

    I.       Freestanding actual innocence mandating relief under the Federal and Ohio Constitutions.

(*Id*.) The State moved to dismiss Alvarado's Motion for Leave and Post-Conviction Petition primarily on the grounds they were untimely filed. (Doc. No. 12-1, Exhs. 23, 24.)

---

[1] Alvarado also attached a number of other affidavits in support of his Motion, including his own affidavit, and affidavits from four patrons at the South Beach Bar on the night of Henderson's death stating they never saw Alvarado in possession of a knife.

[2] Among other things, Alvarado argued that "Prior to trial, counsel [John Thebes] was ineffective by failing to disclose that he had previously represented Charles Wells in 2012 and in fact still owes him [i.e., Wells] money from failing to complete his obligations in CRB-12-01061- 0202." (*Id*. at Page ID# 397.)

On March 16, 2016, the state trial court denied Alvarado's Motion and Petition on the grounds Alvarado had "failed to establish that he was unavoidably prevented from timely discovering the evidence on which he now relies, and that [Alvarado] has not submitted sufficient evidence of unavoidable delay to merit a hearing on the matter." (Doc. No. 12-1, Exh. 25.)

On April 14, 2016, Alvarado, through counsel, filed a notice of appeal to the state appellate court. (Doc. No. 12-1, Exh. 26.) In his merit brief, Alvarado raised the following grounds for relief:

> I. The trial court abused its discretion when it denied Mr. Alvarado's motion for leave to file a motion for new trial, without holding a hearing on the issue of whether Mr. Alvarado was unavoidably prevented from discovery of the key witness's recantation.
>
> II. The trial court erred as a matter of law in denying Mr. Alvarado's petition for post-conviction relief without holding a hearing on the issue of whether Mr. Alvarado was unavoidably prevented from discovery of the key witness's recantation.

(Doc. No. 12-1, Exh. 27.) The State filed a brief in opposition, to which Alvarado replied. (Doc. No. 12-1, Exh. 28; Doc. No. 26, Exh. 36.)

On May 12, 2017, the state appellate court affirmed the trial court's denial of Alvarado's Motion for New Trial and Petition for Post-Conviction Relief. (Doc. No. 26, Exh. 37.) The state appellate court explained as follows:

> {¶28} Here, appellant was convicted in August 2013, and he filed his motion for leave to file a motion for new trial and petition for postconviction relief -in December 2015, well beyond the120-day limit in Crim.R. 33 and the 360-day limit set forth in R.C. 2953.23(A). Thus, appellant was required to establish that he was unavoidably prevented from timely discovering the evidence upon which he relies. Moreover, in order for appellant to be entitled to a hearing on his motion for leave or petition for postconviction relief, the evidence submitted to the trial court by appellant must have, on its face, supported his claim that he was unavoidably

prevented from timely discovering the evidence upon which he now relies.

{¶29} As an initial matter, we note no argument or issue was raised by appellant at the trial court level or in his briefs before us concerning the timeliness of discovery of the information in the affidavits of Basilia Smith, Nolberto Armenta, DeAna and Mario Parraz and the Toledo Police Department Supplemental Crime Report of Detective Rider, which sets forth a summary of Wells' interview with Detective Goodlet, all of which were filed by appellant in support of his motion for leave and petition for postconviction relief. We will therefore only concern ourselves with whether the affidavits of appellant and Wells, on their face, support the claim that appellant was unavoidably prevented from timely discovering the new evidence on which he relies.

{¶ 30} A review of appellant's affidavit and Wells' affidavit reveals no indication as to why or when Wells had a change of conscience and decided to cooperate and recant his trial testimony. There is no averment in either affidavit as to what prompted Wells to contact appellant's current counsel, or when or how Wells became aware of appellant's current counsel. In addition, neither affidavit mentions why appellant nor his counsel did not or could not contact Wells prior to November 2015, when Wells executed his affidavit, to secure Wells' cooperation.

{¶31} In light of the foregoing, we find the affidavits on their face fail to establish that appellant was unavoidably prevented from discovering the new evidence upon which he now relies. Thus, the trial court did not abuse its discretion in denying both appellant's motion for leave to file a motion for new trial and petition for postconviction relief without holding a hearing. Accordingly, appellant's assignments of error are not well-taken.

(*Id.* at PageID# 1303-1304.)

On June 23, 2017, Alvarado, through counsel, filed a notice of appeal to the Ohio Supreme Court. (Doc. No. 26, Exh. 38.) In his Memorandum in Support of Jurisdiction, Alvarado raised the following four Propositions of Law:

I.    A defendant's due process rights are violated and he is unavoidably prevented from discovering new evidence when the prosecution (1) withholds material, exculpatory evidence, and (2) knowingly presents false evidence at trial. 5th and 14th Amendments to the United States Constitution; Article I, Section 16, Ohio Constitution; Crim. R.33(B).

II.   The requirement in Criminal Rule 33(B) that a defendant show by clear and convincing proof that he was "unavoidably prevented from the discovery of

15

the evidence upon which he must rely" before he may file a motion for new trial based on newly discovered evidence does not require the defendant to contact the prosecution's witnesses and implore them to recant their trial testimony. Crim. R. 33(B). U.S. Const. 6th and 14th Amend.

III    A defendant is denied his right to the effective assistance of counsel when his trial and appellate attorney has an undisclosed conflict of interest that prevents him from timely discovering exonerating evidence, failed to investigate corroborating witnesses, and failed to properly advise on plea. U.S. Const. 6th Amend.; Article I, Section 10, Ohio Constitution.

IV    The conviction and incarceration of an innocent person violates the United States Constitution. U.S. Const. 8th and 14th Amend.

(Doc. No. 26, Exh. 39.) The State filed a brief in opposition. (Doc. No. 26, Exh. 40.) On January 30, 2018, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4). (Doc. No. 26, Exh. 41.)

## B.    Proceedings in this Court

On October 20, 2016, Alvarado, through counsel, filed the instant Petition, raising the following nine grounds for relief:

I.    The prosecutor violated Petitioner's right to a fair trial by improper and prejudicial statements.

II.    The State violated Petitioner's rights to due process and fair trial when it suppressed favorable, material evidence. *Brady v. Maryland*, 373 U.S. 83 (1963).

III.    The State violated Petitioner's right to due process and fair trial when it presented false evidence or allowed it to go uncorrected.

IV.    The evidence against Petitioner is insufficient to sustain his conviction, thus violating Petitioner's due process rights under the 14th Amendment.

V.    Petitioner is actually innocent of the crime for which he was convicted, and his convictions violate the 14th Amendment.

VI.    The trial court violated Petitioner's rights to due process and fair trial by erroneously instructing the jury and relieving the State from its burden of

proving every element of the offense charged beyond a reasonable doubt.

VII.   Petitioner was denied his constitutional right to assistance of counsel provided by the Sixth Amendment.

VIII.  Petitioner was denied his right to effective assistance of appellate counsel. U.S. Const. Amends. VI and XIV.

IX.    Petitioner was denied his constitutional right to conflict free counsel when his attorney had both represented Petitioner and the State's main witness against Petitioner.

(Doc. No. 1.)[3]

Shortly thereafter, on October 28, 2016, Alvarado filed a Motion for Stay and Abeyance.

(Doc. No. 5.)  In his Motion, Alvarado argued his Second, Third, Fifth, Seventh and Ninth

Grounds for Relief were not yet exhausted because they were raised in his Motion for Leave to

file Motion for New Trial and Petition for Post-Conviction Relief, both of which were the

subject of his then- pending appeal in the state appellate court.  Alvarado maintained his habeas

petition should be stayed because "there is good cause for his failure to exhaust his claims, his

claims are potentially meritorious, and he has not intentionally engaged in dilatory tactics."  (*Id.*

at 4.)  Respondent filed a cursory opposition to Alvarado's Motion to Stay on November 17,

2016, in which it principally argued the Motion was "premature."  (Doc. No. 9.)

On December 27, 2016, Respondent filed its Return of Writ, along with portions of the

state court record.  (Doc. No. 12.)  Therein, Respondent argued the majority of Alvarado's

claims (including those that were the subject of his Motion to Stay) were procedurally

defaulted.  (*Id.*)  Respondent further maintained Alvarado had failed to establish cause and

---

[3] As noted *infra*, in his Traverse, Alvarado withdrew his Sixth Ground for Relief.  (Doc. No. 32 at 38.)

prejudice, or actual innocence, to excuse the default.  (*Id.*)

On February 7, 2017, the undersigned issued a Report & Recommendation that Alvarado's Motion to Stay be granted in order to allow him to exhaust his Second, Third, Seventh and Ninth Grounds for Relief.  (Doc. No. 17.)  No objections were filed and, on March 3, 2017, the Report & Recommendation was adopted and the instant matter was stayed.  (Doc. No. 18.)  Alvarado was instructed to (1) file quarterly status reports in this Court regarding the progress of his state court appeal; and (2) seek reinstatement on this Court's active docket within thirty days of fully exhausting his state court remedies.  (*Id.*)

Alvarado filed Quarterly Status Reports on March 28, June 28, September 29, and December 29, 2017.  (Doc. Nos. 19, 20, 21, 22.)  On February 26, 2018, Alvarado filed a Notice that he had exhausted his claims in state court, and requested the Petition be reinstated to the Court's active docket.  (Doc. No. 23.)  Alvarado's request was granted shortly thereafter, and this matter was referred to the undersigned for further proceedings.  (Doc. No. 24.)

On March 2, 2018, the undersigned ordered Respondent to supplement the state court record to reflect proceedings occurring during the stay of the instant Petition.  (Doc. No. 25.)  Respondent filed a Supplemental State Court Record on April 2, 2018.  (Doc.  No. 26.)

On May 8, 2018, Alvarado filed a Motion for Discovery regarding his Second, Third, Seventh and Ninth Grounds for Relief.  (Doc. No. 28.)  Therein, he requests leave to conduct the depositions of Charles Wells; defense attorney John Thebes; Toledo Police Detectives William Goodlet and Tonya Rider; and Lucas County Prosecutors Michael Bahner, Clinton

Wasserman, and Charles McDonald.[4]  (*Id*. at 2.)  Alvarado also seeks leave to obtain copies of

(1) all files concerning his own prosecution; (2) all files concerning the prosecution of Charles

Wells in Lucas County Court of Common Pleas Case Nos. G-4801-CR-201302717-000 and G-

201301780-000; and (3) all files "concerning the incident at the South Beach Bar and Grill on

December 31, 2012 and January 1, 2013, and the murder of Christina Henderson and assault on

Stacey Bowen, in possession of the Toledo Police Department."  (*Id*.)  Respondent filed a brief

in opposition, to which Alvarado replied.  (Doc. Nos. 30, 31.)

On May 21, 2018, Alvarado filed a Motion to Expand/Complete the Record, in which he

seeks an Order requiring Respondent to submit the exhibits from his underlying state court trial.

(Doc. No. 29.)  Respondent filed a brief in opposition, to which Alvarado replied.  (Doc. Nos.

33, 34.)

Meanwhile, and while these Motions were pending, Alvarado filed his Traverse on June

1, 2018.[5]  (Doc. No. 32.)  Respondent filed a Sur-Reply to the Traverse on June 18, 2018.  (Doc.

No. 35.)

## II.  Motion for Leave to Conduct Discovery

### A.  Standard

"[U]nlike the usual civil litigant in federal court, [a habeas petitioner] is not entitled to

discovery as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S.Ct.

---

[4] Messrs. Bahner and Wasserman were the prosecutors assigned to Alvarado's underlying
state court criminal case.  Mr. McDonald was the prosecutor assigned to the then-pending
criminal cases against Mr. Wells.

[5] Therein, Alvarado withdrew his Sixth Ground for Relief.  (Doc. No. 32 at 38.)

1793, 138 L.Ed.2d 97 (1997).  Rule 6 of the Rules Governing Section 2254 Cases allows the

discovery available under the Federal Civil Rules "if, and to the extent that, the judge in the

exercise of his discretion and for good cause shown grants leave to [take discovery], but not

otherwise."  Habeas Rule 6(a).  "Good cause" for discovery exists only "where specific

allegations before the court show reason to believe that the petitioner may, if the facts are fully

developed, be able to demonstrate that he is . . . entitled to relief."  *Bracy*, 520 U.S. at 908–09

(quoting *Harris v. Nelson*, 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969)) (ellipsis in

original).  "The burden of demonstrating the materiality of the information requested is on the

moving party."  *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Stanford v.

Parker*, 266 F.3d 442, 460 (6th Cir. 2001)).  Habeas Rule 6 does not "sanction fishing

expeditions based on a petitioner's conclusory allegations."  *Williams*, 380 F.3d at 974.  Instead,

a habeas petitioner must show good cause for discovery through "specific allegations of fact."

*Id*. (quotation marks omitted).

This Court does not apply Habeas Rule 6 in isolation.  When a state court has already

decided a constitutional claim, a petitioner must show that decision was contrary to, or an

unreasonable application of, clearly established federal law based only on "the record that was

before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S.

170, 131 S. Ct. 1388, 1398, 179 L.Ed.2d 557 (2011); *see also* 28 U.S.C. § 2254(d)(1).

"[R]eview under § 2254(d)(1) focuses on what a state court knew and did," and, thus, "[i]t

would be strange to ask federal courts to analyze whether a state court's adjudication resulted in

a decision that unreasonably applied federal law to facts not before the state court."  *Pinholster*,

131 S. Ct. at 1399.  Likewise, a petitioner who argues a state court's ruling depends on

unreasonable findings of fact generally may point to only "evidence presented in the State court proceeding." *Wood v. Allen*, 558 U.S. 290, 293, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010).

In sum, "federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Pinholster*, 131 S. Ct. at 1401 (quotation marks omitted). As a result, "district courts are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue." *Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013).

Courts have recognized that *Pinholster* did not expressly consider Habeas Rule 6 or otherwise directly address the availability of discovery in federal habeas proceedings. *See e.g., Davis v. Bobby*, 2017 WL 2544083 at *3 (S.D. Ohio June 13, 2017) ("As...numerous courts have recognized, neither the Supreme Court nor...[the] Sixth Circuit has provided explicit guidance on the interplay between *Pinholster* and the availability of discovery in habeas corpus proceedings."); *Broom v. Bobby*, 2018 WL 1621083 at * 4-5 (N.D. Ohio April 4, 2018) ("*Pinholster* did not, however, address the availability of discovery in federal habeas proceedings. And neither the Supreme Court nor the Sixth Circuit Court of Appeals has directly addressed the issue since *Pinholster* was decided.") However, the Sixth Circuit has, under Section 2254(d)(1) review, disregarded evidence gathered during federal habeas proceedings. *See Loza v. Mitchell*, 766 F.3d 466, 494 (6th Cir. 2014). Moreover, district courts within this Circuit have applied *Pinholster* to factual development through discovery in federal habeas proceedings where the claims at issue were adjudicated on the merits in state courts. *See e.g., Broom*, 2018 WL 1621083 at ** 4-5 ("This Court agrees with the majority position that

*Pinholster* applies to factual development through discovery in federal habeas proceedings, and precludes petitioners from conducting discovery on claims that were adjudicated on the merits in state courts . . ."); *Davis*, 2017 WL 2544083 at *3 ("*Pinholster*'s holding necessarily informs any determination as to whether discovery is warranted....Put simply, unusable evidence cannot lead to relief."*); Caudill v. Conover*, 871 F. Supp. 2d 639, 646 (E.D. Ky. 2012) ("It would defy logic to preclude a petitioner from developing factual information in an evidentiary hearing [under *Pinholster*], but allow [the petitioner] to introduce the same factual information via discovery and expansion of the record."); *Blevins v. Warden, Ross Corr. Inst*., 2011 WL 6141062, at *4 (S.D. Ohio Dec. 9, 2011) ("*Pinholster* is not irrelevant to discovery in federal habeas....There cannot be good cause to collect evidence which cannot be presented.")

Nevertheless, *Pinholster* did not completely bar federal habeas courts from considering new evidence. *Lang v. Bobby*, 2014 WL 5393574 at * 3 (N.D. Ohio Oct. 23, 2014). *Pinholster*'s restrictions do not apply to claims that were not adjudicated on the merits by the state courts. *Pinholster*, 131 S.Ct. at 140. *See also Cunningham v. Hudson*, 756 F.3d 477, 487 n. 4 (6th Cir.2014). A federal habeas court may also consider new evidence when deciding whether there is cause and prejudice or actual innocence to excuse a procedurally defaulted claim. *See House v. Bell*, 547 U.S. 518, 537–38, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006); *Cunningham*, 756 F.3d at 487 n.4. *See also Sample v. Colson*, 958 F.Supp.2d 865, 888 (W.D. Tenn. 2013) ("Since procedural default does not automatically bar discovery in habeas cases, discovery is allowed in this case if it would lead to evidence that could excuse the apparent procedural default of Petitioner's claims."); *Johnson v. Bobby,* 2018 WL 1382455 at * 8 (S.D. Ohio March 19, 2018) (finding Pinholster does not apply "if the Court is considering whether to

excuse a procedural default."); *Broom*, 2018 WL 1621083 at * 4-5; *Lang*, 2014 WL 5393574 at * 3.

### B.     Analysis

#### 1.     Second and Third Grounds For Relief (*Brady/Giglio*)

Alvarado seeks leave to conduct discovery regarding his Second and Third Grounds for relief. (Doc. No. 28.) In his Second Ground, Alvarado claims the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) when it failed to disclose that Wells (1) could not initially identify Alvarado; (2) did not see a knife in Alvarado's hand at any point the night Henderson was killed; (3) did not see Alvarado stab Henderson; and (4) had a prospective deal with the State in exchange for his testimony implicating Alvarado. (Doc. No. 1 at 19-23.) In his Third Ground, Alvarado claims the State violated his rights to due process and a fair trial under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) when it knowingly permitted Wells to falsely testify that (1) he saw Alvarado with a knife; (2) he saw Alvarado strike Henderson in the neck with an object; and (3) the prosecutor did not promise him anything in exchange for his testimony. (*Id*. at 24-28.)

With regard to these claims, Alvarado seeks discovery to obtain information regarding "the interactions between the state and Wells." (Doc. No. 28 at 4.) Specifically, Alvarado seeks discovery regarding Wells' conversations with Toledo Police Detectives Goodlet and Rider and Lucas County Prosecutors Bahner and Wasserman regarding a variety of issues, including Wells' ability to identify Alvarado, statements Wells made regarding whether he saw Alvarado with a knife, and any potential deals the prosecutor offered Wells with respect to his

pending drug charges.[6] (*Id.* at 6.) Alvarado also requests copies of the Police and Prosecutor's files, "so that he can determine what communication the state had with Wells throughout its investigation, during Alvarado's trial, and after, as it pertains to this case." (*Id.* at 7.) In particular, Alvarado argues these files "in particular can be helpful in shedding light on how much the prosecutors knew regarding Wells' true lack of knowledge of who stabbed Henderson. They may also contain documentation regarding the consideration sought by and promised to Wells." (*Id.*) Lastly, Alvarado seeks to depose Lucas County Prosecutor Charles McDonald (who prosecuted Wells' two pending cases) and obtain copies of his files relating to Wells' cases, arguing this discovery "could reveal information concerning any consideration sought by and promised to Wells." (*Id.*)

Respondent argues Alvarado's Motion should be denied because "this Court can resolve the issues presented based on the state court record." (Doc. No. 30 at 3.) Respondent asserts Alvarado's Second and Third Grounds for relief are procedurally defaulted, and maintains

---

[6] With respect to these pending charges, the state court docket reflects Wells was charged in October 2013 with one count of aggravated possession of drugs (F5), one count of aggravated trafficking in drugs (F4), one count of possession of heroin (F4), one count of trafficking in heroin (F4), one count of possession of cocaine (F5), and one count of trafficking in cocaine (F5). *See* Docket Sheet for *State v. Wells*, Lucas County Court of Common Pleas Case No. G-4801-CR-201302717. Previously, in May 2013, Wells was charged with one count of domestic violence (F3) and one count of attempt to commit aggravated assault (F5) in a different case. *See State v. Wells*, Lucas County Court of Common Pleas, Case No. G-4801-CR-201301780. In November 2013 (three months after Alvarado's trial), Wells entered no contest pleas to two fifth degree felony drug charges (aggravated possession of drugs and possession of cocaine) and an *Alford* plea to a fifth degree felony charge of attempt to commit aggravated assault. *See State v. Wells*, Lucas County Court of Common Pleas, Case Nos. G-4801-CR-201302717 and G-4801-CR-201301780. According to the state court docket sheets, Wells did not receive prison time in connection with these pleas but, rather, was sentenced to a total of two years of community control for all three felonies. *Id.*

discovery should be denied because "most of the discovery Alvarado seeks here does not even attempt to address cause – i.e., why post-conviction counsel failed to fairly present any of these grounds." (*Id*. at 6.) Respondent further argues that "none of the discovery can establish 'actual prejudice' or actual innocence." (*Id*.) Respondent asserts discovery should be denied for the additional reason that "Alvarado has failed to make a *prima facie* showing of what he intends to find and prove if he does receive the requested discovery." (*Id*.) Lastly, Respondent argues Wells' recantation affidavit is highly suspect and, further, that any of the additional impeachment evidence presented therein would have been cumulative to Wells' testimony on cross-examination regarding his extensive criminal record and use of marijuana on the night in question. (*Id*. at 7-8.)

As noted above, Alvarado's Second Ground for relief asserts a claim under *Brady, supra*. To succeed on a *Brady* claim, a petitioner must establish: (1) the existence of favorable evidence, either exculpatory or impeaching; (2) that the evidence was suppressed; and (3) that the suppression resulted in prejudice. *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). *See also Hill v. Mitchell*, 842 F.3d 910, 926 (6th Cir. 2016). To be exculpatory, the evidence must be favorable to the defendant in a way that is apparent to law enforcement. *Moldowan v. City of Warren*, 578 F.3d 351, 383, 388 (6th Cir. 2009). To be impeaching, the evidence must show the bias or prior inconsistency of one of the State's witnesses. *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Lastly, to show cognizable prejudice, a petitioner must establish that the suppressed evidence is material; i.e., that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v.*

*Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The question is whether

"'the favorable evidence could reasonably be taken to put the whole case in such a different

light as to undermine confidence in the verdict.' " *Strickler*, 527 U.S. at 290 (quoting *Kyles,* 514

U.S. at 435.) Speculation about a different outcome is not enough; " '[t]he likelihood of a

different result must be substantial, not just conceivable.'" *LaMar v. Houk*, 798 F.3d 405, 416

(6th Cir. 2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 112, 131 S.Ct. 770, 178 L.Ed.2d

624 (2011)). That is, the likelihood of a different result must be great enough to undermine

confidence in the verdict. *Wearry v. Cain*, —— U.S. ——, 136 S.Ct. 1002, 1006, 194 L.Ed.2d

78 (2016) (citing *Smith v. Cain*, 565 U.S. 73, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012)).

Alvarado's Third Ground for relief asserts the State violated his constitutional rights

when it knowingly relied on perjured testimony. "The Supreme Court has long held that a

prosecutor violates a criminal defendant's due process rights when she knowingly allows

perjured testimony to be introduced without correction." *Thomas v. Westbrook*, 849 F.3d 659,

666 (6th Cir. 2017) (citing *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d

342 (1976)). To prove that the prosecutor's failure to correct false testimony violated due

process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the

statement was material; and (3) the prosecution knew it was false.[7] *See Rosencratz v. Lafler*,

---

[7] As the Sixth Circuit has explained: "In these *Brady/Giglio* claims, the materiality assessment is less stringent than that for more general *Brady* withholding of evidence claims. We weigh the materiality of *Brady* withholding claims by asking whether 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). By contrast, for *Brady/Giglio* claims, we ask only 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' *Agurs*, 427 U.S. at 104, 96 S.Ct. 2392 (citing *Giglio*, 405 U.S. at 154, 92 S.Ct. 763)."

568 F.3d 577, 583-584 (6th Cir. 2009); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir.1998);

*Abdus–Samad v. Bell*, 420 F.3d 614, 625–26 (6th Cir.2005); *Carter v. Bell*, 218 F.3d 581, 601

(6th Cir.2000).

Here, Respondent asserts Alvarado's Second and Third Grounds for Relief are

procedurally defaulted because they were raised for the first time in Alvarado's Motion for New

Trial and Petition for Post-Conviction Relief, both of which were denied by the state courts on

procedural grounds. (Doc. No. 12 at 22-24.) Alvarado does not dispute that these claims were

not adjudicated on the merits by the state courts. (Doc. No. 32 at 60.) As such, the restrictions

set forth in *Pinholster* barring consideration of evidence outside the state court record, do not

apply to these claims. *See Cunningham*, 756 F.3d at 487.

As noted *supra*, a federal court may consider new evidence when deciding whether there

is cause and prejudice or actual innocence to excuse a defaulted claim. *Id. See also House*, 547

U.S. at 537-538. Of particular relevance herein, the Sixth Circuit has held that "showing an

actual *Brady* violation is itself sufficient to show cause and prejudice." *Jones v. Bagley*, 696

F.3d 475, 486-487 (6th Cir. 2012) (citing *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256,

157 L.Ed.2d 1166 (2004)). *See Brooks v. Tennessee*, 626 F.3d 878, 890–91 (6th Cir. 2010);

*Bell v. Bell*, 512 F.3d 223, 230 n.3 (6th Cir. 2008) ("[A] petitioner who proves a *Brady* violation

demonstrates cause and prejudice to excuse procedural default of the *Brady* claim"). *See also*

*Davis v. Freeman*, 2018 WL 1545739 at * 18-20 (M.D. Tenn. 2018)("A meritorious *Brady*

claim may excuse procedural default . . ."); *Frazier v. Johnson*, 2018 WL 1585790 at * 12 (E.D.

Tenn. March 30, 2018) ("A petitioner who proves a *Brady* violation demonstrates cause and

---

*Rosencrantz*, 568 F.3d at 584.

prejudice to excuse procedural default of the *Brady* claim.").

For the following reasons, the Court finds Alvarado has demonstrated "good cause" to conduct discovery regarding his Second and Third Grounds for Relief. Alvarado has set forth specific allegations which, if proven, could lead to federal habeas relief. Specifically, based on Wells' recantation affidavit, Alvarado asserts the State knew but failed to disclose that Wells could not initially identify Alvarado in the surveillance video footage and did not see a knife in Alvarado's hand at any point on the night Henderson was killed. Alvarado further asserts the State offered Wells a prospective deal regarding his pending charges; i.e., "[t]he Prosecutor said 'I will do everything I can do make it go away.' [It being the pending charges.]" in exchange for Wells' cooperation and testimony against Alvarado. (Doc. No. 12-1, Exh. 21 at PageID# 409-410.)

The state court dockets regarding Wells' two underlying criminal cases reflect he was charged with one count of aggravated possession of drugs (F5), one count of aggravated trafficking in drugs (F4), one count of possession of heroin (F4), one count of trafficking in heroin (F4), one count of possession of cocaine (F5), and one count of trafficking in cocaine (F5) in Lucas County Court of Common Pleas Case No. G-4801-CR-201302717; and one count of domestic violence (F3) and one count of attempt to commit aggravated assault (F5) in Lucas County Court of Common Pleas, Case No. G-4801-CR-201301780. Three months after Alvarado's trial, Wells entered no contest pleas to two fifth degree felony drug charges (aggravated possession of drugs and possession of cocaine) and an *Alford* plea to a fifth degree felony charge of attempt to commit aggravated assault. *See State v. Wells*, Lucas County Court of Common Pleas, Case Nos. G-4801-CR-201302717 and G-4801-CR-201301780. According

to the state court docket sheets, Wells did not receive prison time in connection with these pleas but, rather, was sentenced to a total of two years of community control for all three felonies, despite a lengthy criminal record.[8] *Id.*

Evidence of a deal between Wells and the State would have allowed Alvarado to further impeach Wells' credibility, as would evidence that Wells initially told police he could not identify Alvarado and did not see him with a knife on the night in question. If such evidence exists, it was apparently not produced. This potential evidence is particularly significant given the fact that Wells' credibility was central to the State's case. As the state appellate court noted, "[w]hile grainy video surveillance footage showed appellant in Henderson's vicinity, a raised table was blocking the view of the camera at the moment of the fatal blow. Thus, the case largely turned on the testimony of Wells, and the jury had the primary responsibility for determining his credibility." *State v. Alvarado*, 2015 WL 139519 at * 9 (Ohio App. 6th Dist. Jan. 9, 2015). Indeed, during closing argument, the State itself characterized its case as a "one witness case," acknowledging that "a lot of this case falls on Mr. Wells' testimony."[9] (Doc. No.

---

[8] During trial, Wells testified regarding his extensive criminal record. (Doc. No. 12-2 at Tr. 102-104.) Specifically, Wells stated he first went to prison in 1988 for aggravated drug trafficking; was convicted of kidnapping and sentenced to seven years in prison in 2001; and was convicted of grand theft in 2008. (*Id.*) Wells estimated he had been in six or seven different prisons in his lifetime. (Tr. 104.) He acknowledged his pending drug and assault cases during Alvarado's trial but testified he had not had any conversations with the Prosecutor about those cases and had not been offered any deals. (Tr. 104-105, 143-146.)

[9] The State acknowledged it had not conducted a "perfect investigation" and that the "conditions for this investigation were not ideal," referencing the fact that employees of the South Beach Bar cleaned up blood from the crime scene before the police arrived. (Doc. No. 12-2 at Tr. 498.) The State also acknowledged there was no DNA or fingerprint evidence, and that the police did not find either the murder weapon or any bloody clothing belonging to Alvarado. (*Id.* at Tr. 501-503.) Finally, the State acknowledged the video surveillance system was "not perfect." (*Id.* at Tr. 500.)

12-2 at Tr. 561-562.)

In light of the above, the Court finds Alvarado has provided "specific factual allegations" that provide "reason to believe" he might satisfy the elements of the *Brady* and *Giglio* claims set forth in his Second and Third Grounds for Relief. Accordingly, the Court grants Alvarado leave to conduct the depositions of Charles Wells, Toledo Police Detectives William Goodlet and Tonya Rider, and Lucas County Prosecutors Michael Bahner, Clinton Wasserman, and Charles McDonald. The Court further orders Respondent to produce full and complete copies of (1) all files regarding Alvarado's prosecution for the death of Christina Henderson; (2) all files concerning the prosecution of Charles Wells in Lucas County Court of Common Pleas Case Nos. G-4801-CR-201302717-000 and G-201301780-000; and (3) all files concerning the police investigation of the incident at the South Beach Bar and Grill on December 31, 2012 and January 1, 2013, and the murder of Christina Henderson and assault on Stacey Bowen. The Court will schedule a telephonic conference call via separate Order, to discuss reasonable case management deadlines for the above discovery.

### 2. Seventh and Ninth Grounds for Relief (Ineffective Assistance of Trial Counsel; Conflict-Free Counsel)

Alvarado also seeks leave to conduct discovery regarding his Seventh and Ninth Grounds for Relief. In his Seventh Ground for Relief, Alvarado argues defense counsel was ineffective for (1) failing to properly counsel Alvarado on the state's plea offer, (2) misrepresenting the nature of the charges against Alvarado, (3) failing to investigate or ask for a continuance so he could investigate, (4) failing to adequately prepare for trial, (5) failing to object to instances of prosecutorial misconduct and erroneous jury instructions, (6) failing to call witnesses, and (7) failing to submit an affidavit of indigency or timely appeal. (Doc. 1 at

41-44.)  In his Ninth Ground for Relief, Alvarado asserts he was also denied his right to effective counsel because defense counsel had a conflict arising from his previous representation of Charles Wells.  (*Id*. at 47-49.)

With regard to these claims, Alvarado seeks discovery to obtain further information regarding the nature of Wells' attorney-client relationship with Alvarado's defense counsel as well as "any outstanding issues between them at Alvarado's trial."  (Doc. No. 28 at 8-9.)  In particular, Alvarado seeks discovery regarding Wells' statements in his recantation affidavit that Alvarado's defense counsel (1) appeared twice on Wells' behalf in Toledo Municipal Court Case No. CRB-12-01061-0202;[10] (2) "never saw the case through;" and (3) currently owes Wells money in connection with that case.  (Doc. No. 12-1, Exh. 21 at Page ID# 409-410.) Lastly, Alvarado seeks to "explore [defense counsel's] actions and inactions at trial and the nature of his previous representation of Wells."  (*Id.*)

Respondent argues discovery should be denied.  First, Respondent argues the majority of Alvarado's ineffective assistance sub-claims are "only asserted in conclusory fashion" and should therefore be considered waived.  (Doc. No. 30 at 9.)  With respect to Alvarado's ineffective assistance claim based on defense counsel's advice during plea negotiations, Respondent argues Alvarado presents only "bald assertions" and conclusory allegations.  (*Id*.) With respect to Alvarado's claim defense counsel failed to properly investigate, Respondent notes both Wells and Detective Goodlet were subject to vigorous cross-examination.  (*Id*.)

---

[10] According to the docket in that case, Wells was initially represented by Alvarado's defense counsel in April, May, and early June of 2012.  On June 11, 2012, the docket indicates Wells requested a public defender.  He was found indigent on that date, and assigned a Public Defender.  *See City of Toledo v. Charles Wells*, Toledo Municipal Court Case No. CRB-12-1061-0102. Alvarado was indicted approximately six months later, in January 2013.

Finally, with respect to Alvarado's claim that defense counsel had a conflict of interest, Respondent argues Alvarado has presented no evidence of "active representation of competing interests." (*Id.* at 10.) Respondent further asserts "there is no evidence that [defense counsel] owed Wells money," noting "[n]either Wells nor Alvarado has produced any documentation regarding fees, a complaint to disciplinary counsel, or any letter from disciplinary counsel finding that [defense counsel] failed to return an unearned portion of fees." (*Id.* at 10-12.) Finally, Respondent notes that "Alvarado does not allege that he, through counsel, has even attempted to talk with former counsel." (*Id.* at 12.)

To establish ineffective assistance of counsel, a petitioner must demonstrate that his counsel's conduct was so below acceptable standards of representation that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also Hendrix v. Palmer*, 893 F.3d 906, 921 (6th Cir. 2018). A petitioner also must demonstrate that a trial counsel's performance prejudiced the petitioner's defense to such an extent that it rendered the proceeding unfair. *Id.* To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In other words, a counsel's deficient performance must have "caused the defendant to lose what he otherwise would probably have won" and it must have been "so manifestly ineffective that defeat was snatched from the hands of probable victory." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). *See also Hendrix*, 893 F.3d at 921 ("Counsel's errors must have 'actually had an adverse effect on [the petitioner's] defense.'") (quoting *Strickland*, 466 U.S. at 693.)

A habeas petitioner may satisfy the above standard by showing that his defense counsel labored under an "actual conflict of interest." *Gillard v. Mitchell*, 445 F.3d 883, 890 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 692 (holding that proof of an actual conflict satisfies ineffectiveness prong, and creates a presumption of prejudice)). "An actual conflict ... is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). To meet this standard, a petitioner must show that "counsel was influenced in his basic strategic decisions by the interests of the former client." *Moss v. United States*, 323 F.3d 445, 466 (6th Cir.2003) (quoting *Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). That is, a petitioner must show that his attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Id*. (quoting *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir.1987)); *see also Jalowiec v. Bradshaw*, 657 F.3d 293, 317 (6th Cir. 2011). The existence of an adverse effect is "more likely to be evident in cases in which an attorney takes positive steps on behalf of one client prejudicial to another than in cases in which the attorney's actions are based on inaction and are passive." *McFarland v. Yukins*, 356 F.3d 688, 706 (6th Cir.2004) (quoting *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir.1988)). *See also Jalowiec*, 657 F.3d at 317.

If a petitioner establishes that defense counsel's divided loyalties affected his representation, then prejudice is presumed and need not be proven. *Gillard*, 445 F.3d at 890 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348-350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). "Yet, even in the case of such a conflict of interest, '[p]rejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an

actual conflict of interest adversely affected his lawyer's performance.' " *Jalowiec*, 657 F.3d at 314 (quoting *Strickland*, 466 U.S. at 692 and *Sullivan*, 446 U.S. at 350.)

Successive representation, however, is considered under a different standard. *See Whiting v. Burt,* 395 F.3d 602 (6th Cir. 2005); *Gillard*, 445 F.3d at 891. "Successive representation occurs where defense counsel has previously represented a co-defendant or trial witness." *Moss*, 323 F.3d at 459. *See also Jalowiec*, 657 F.3d at 315. As the Sixth Circuit has explained, "[s]imultaneous and successive representation differ materially because in the latter, the attorney is no longer beholden to the former client." *Gillard,* 445 F.3d at 891. "Because the Supreme Court has not held that successive representation gives rise to a presumption of prejudice, the *Sullivan* presumption does not control this habeas case." *Id. See also Mickens*, 535 U.S. at 174-76, 122 S.Ct. 1237; *Moss*, 323 F.3d at 460-62; *Lordi v. Ishee,* 384 F.3d 189, 193 (6th Cir. 2004) ("The presumed prejudice standard for ineffectiveness claims based on a conflict of interest detailed in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), is inapplicable to cases of successive representations.")

For the following reasons, the Court finds Alvarado has failed to demonstrate "good cause" to conduct discovery regarding his Seventh and Ninth Grounds for Relief. As noted above, in his Seventh Ground for Relief, Alvarado claims counsel was ineffective for, among other things, (1) failing to properly counsel Alvarado on the state's plea offer, (2) misrepresenting the nature of the charges against Alvarado, (3) failing to object to instances of prosecutorial misconduct and erroneous jury instructions, (4) failing to call witnesses, and (5) failing to submit an affidavit of indigency or timely appeal. (Doc. 1 at 41-44.) With respect to these specific sub-claims, Alvarado has not set forth specific allegations in his Motion

demonstrating that discovery is warranted. Specifically, aside from a conclusory reference to the affidavits attached to his Motion for New Trial, Alvarado fails to identify the information he hopes to obtain through discovery with respect to these sub-claims and, further, fails to articulate how he would be able to demonstrate he is entitled to habeas relief if the facts were fully developed. Accordingly, Alvarado's request for discovery regarding these sub-claims is denied.

Alvarado's Seventh Ground for Relief also asserts defense counsel was ineffective for failing to investigate (or ask for a continuance so he could investigate) and failing to adequately prepare for trial. Alvarado references generally, and in conclusory fashion, "the affidavits of numerous witnesses who [defense counsel] failed to call to testify." (Doc. No. 28 at 8.) This appears to be a reference to the affidavits of Basilia Smith, Nolberto Armenta, Deana Parraz, and Mario Parazz, each of whom averred that they did not see Alvarado with a knife on the night in question and did not believe he killed Henderson. (Doc. No. 12-1 at Page ID#s 415-422.) These individuals state they were not contacted or interviewed by defense counsel. (*Id.*) None of them were called as witnesses at trial.

The Court finds Alvarado has not set forth specific allegations in his Motion demonstrating that discovery is warranted with respect to these sub-claims. While he cites generally to the witness affidavits noted above, Alvarado fails to articulate any meaningful argument as to what information he hopes to obtain by deposing defense counsel on these issues. Nor does he explain how potential evidence from defense counsel might lead to federal habeas relief with respect to his alleged failure to contact Ms. Smith, Mr. Armenta, Ms. Parraz, and Mr. Parazz and call them as witnesses. Accordingly, the Court finds Alvarado has failed to

demonstrate "good cause" for discovery regarding these particular ineffective assistance of counsel sub-claims.

Finally, Alvarado's Ninth Ground for Relief asserts he was denied his right to effective and conflict-free counsel because defense counsel had a conflict arising from his previous, undisclosed representation of Wells. (Doc. No. 1 at 47-49.) In particular, Alvarado seeks discovery regarding Wells' statements in his recantation affidavit that Alvarado's defense counsel (1) appeared twice on Wells' behalf in Toledo Municipal Court Case No. CRB-12-01061-0202; (2) "never saw the case through;" and (3) currently owes Wells money in connection with that case. (Doc. No. 12-1, Exh. 21 at Page ID# 409-410.) Alvarado asserts his defense counsel failed to disclose this conflict and states "[i]f I had known of their history, I would have fired John Thebes immediately and retained substitute counsel. I have a serious issue with this and would not have waived the conflict." (Doc. No. 12-2 at PageID# 413.)

Alvarado's request for discovery regarding defense counsel's alleged conflict of interest is denied. The only basis for this request is Wells' recantation affidavit, which provides as follows:

17.    In addition, I want to go on record and say that Attorney John Thebes owes me money for a case. He promised to represent me on a charge in 2012, on CRB-12-01061-0202 and appeared twice on my behalf, but never saw the case through. The whole trial with Hector, he never acted like we knew each other and never refunded any of my money.

(Doc. No. 12-1 at PageID# 410.) While the state court docket confirms that Alvarado's defense counsel briefly represented Wells in an unrelated criminal case between April and early June 2012, Alvarado has not articulated any specific factual allegations in his Motion demonstrating that discovery is warranted with respect to this claim. Specifically, Alvarado has not set forth

specific factual allegations to demonstrate that discovery would show the existence of an "actual conflict of interest" as a result of his defense counsel's prior representation of Wells. *Gillard*, 445 F.3d at 890. As noted *supra*, "an actual conflict ... is a conflict of interest that adversely affects counsel's performance." *Mickens*, 535 U.S. at 172 n. 5. To meet this standard, a petitioner must show that "counsel was influenced in his basic strategic decisions by the interests of the former client." *Moss*, 323 F.3d at 466. *See also Jalowiec*, 657 F.3d at 317.

Here, Alvarado fails to articulate specific factual allegations that, if proven, would demonstrate his defense counsel's prior representation of Wells influenced his "basic strategic decisions" and thereby adversely affected defense counsel's performance. While not argued directly, Alvarado appears to suggest defense counsel failed to interview Wells prior to trial in light of Wells' allegation that Alvarado's defense counsel owed him money. This argument is without merit. Aside from Wells' unsupported allegation, Alvarado has failed to come forward with any evidence suggesting that defense counsel does, in fact, owe Wells money. As Respondent correctly notes, neither Wells nor Alvarado have produced any documentation regarding fees, a complaint to disciplinary counsel, or any letter from disciplinary counsel finding that defense counsel failed to return an unearned portion of fees. Moreover, Alvarado does not allege he has made any effort to contact defense counsel to obtain further information regarding this issue.

As noted above, Habeas Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations." *Williams*, 380 F.3d at 974. Here, Alvarado has failed to articulate anything more than the conclusory allegation that defense counsel's prior representation of Wells influenced his representation of Alvarado at trial. Alvarado's request

for discovery regarding this issue is, therefore, denied.

Accordingly, and for all the reasons set forth above, Alvarado's request for discovery regarding his Seventh and Ninth Grounds for Relief is denied.

## III.    Motion to Expand/Complete the Record

In his Motion to Expand the Record, Alvarado requests the Court order Respondent to expand the Return of Writ to include the exhibits that were admitted in his state court criminal trial.  (Doc. No. 29.)  He maintains "the trial exhibits were referenced throughout the trial and are critical to this Court's understanding of Alvarado's nine grounds for relief," particularly his sufficiency of the evidence and prosecutorial misconduct claims.  (*Id.* at 3.)

Respondent argues Alvarado's motion should be denied because the majority of his claims are either non-cognizable or procedurally defaulted.  (Doc. No. 33.)  Respondents asserts "the trial exhibits do not appear to be necessary to the adjudication of any of the issues presently before this Court."  (*Id.* at 3.)  However, Respondent "acknowledges that the trial exhibits were made a part of the state court record" and will supplement the record if the Court believes they are necessary for resolution of the instant Petition.  (*Id.*)

Under the Rules Governing Section 2254 Cases, a respondent has discretion to attach to his Answer parts of the record that he considers relevant.  *See* Rule 5(c) of the Rules Governing Section 2254 Cases.  Pursuant to Habeas Rule 5, a district court may thereafter "order that the respondent furnish other parts of the existing transcripts or that parts of untranscribed recordings be transcribed or furnished."  *Id.*  Moreover, Habeas Rule 7 provides that "[i]f the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition."  Rule 7(a) of the Rules Governing §2254 Cases.

Habeas Rule 7 "permits federal habeas corpus courts to direct the parties to supplement the state court record with materials relevant to the Court's resolution of the petition." *Lynch v. Hudson*, 2010 WL 2076925 at * 2 (S.D. Ohio May 24, 2010).

Interpreting these Rules, the Sixth Circuit has recognized that expansion of the record in habeas cases "is not mandatory . . . and is left to the discretion of the trial judge." *Ford v. Seabold*, 841 F.2d 677, 691 (6th Cir. 1988). *See also Beuke v. Houk*, 537 F.3d 618, 653 (6th Cir. 2008); *Bates v. Warden, Chillicothe Correctional Institution*, 2015 WL 5299454 at * 5 (S.D. Ohio Sept. 10, 2015); *Gordon v. Turner*, 2015 WL 3969689 at * 20 (N.D. Ohio June 30, 2015); *Lynch*, 2010 WL 2076925 at * 2.

Alvarado's request to expand the record to include the exhibits introduced at his state court criminal trial is granted. Upon careful review of all of the pleadings in this matter, the Court finds its review would be aided by supplementation of the habeas record to include these exhibits, including the exhibits constituting the relevant surveillance video footage.

Accordingly, Alvarado's Motion to Expand/Complete the State Court Record (Doc. No. 29) is GRANTED. The Court will set a telephonic conference call with counsel via separate Order to discuss a reasonable deadline for production of these exhibits.

## IV.     Conclusion

Accordingly, and for all the reasons set forth above, Alvarado's Motion for Discovery (Doc. No. 28) is GRANTED IN PART and DENIED IN PART as follows:

- Alvarado's request for discovery regarding his Second and Third Grounds for Relief is GRANTED. The Court grants Alvarado leave to conduct the depositions of Charles Wells, Toledo Police Detectives William Goodlet and Tonya Rider, and Lucas County Prosecutors Michael Bahner, Clinton Wasserman, and Charles McDonald. The Court further orders Respondent to produce full and complete copies of (1) all files regarding Alvarado's

39

prosecution for the death of Christina Henderson; (2) all files concerning the prosecution of Charles Wells in Lucas County Court of Common Pleas Case Nos. G-4801-CR-201302717-000 and G-201301780-000; and (3) all files concerning the police investigation of the incident at the South Beach Bar and Grill on December 31, 2012 and January 1, 2013, and the murder of Christina Henderson and assault on Stacey Bowen.

• Alvarado's request for discovery regarding his Seventh and Ninth Grounds for Relief is DENIED.

In addition, Alvarado's Motion to Expand/Complete the Record (Doc. No. 29) is GRANTED. The Court will schedule a telephonic conference call via separate Order, to discuss reasonable case management deadlines.

**IT IS SO ORDERED.**

Date:  September 18, 2018                    _s/ Jonathan D. Greenberg_
                                            Jonathan D. Greenberg
                                            United States Magistrate Judge