IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HECTOR ALVARADO, | ) | CASE NO.  3:16-CV-02563 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE PATRICIA A. GAUGHAN |
| vs. | ) | |
| | ) | |
| OHIO STATE PENITENTIARY, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| Respondent. | ) | |
| | ) | **ORDER** |
| | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is the Petition of Hector Alvarado ("Alvarado" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  Currently pending are Alvarado's (1) Motion for Leave to File an Amended Petition or in the Alternative to File an Amended Traverse (Doc. No. 73); and (2) Motion to Expand the Record (Doc. No. 72).  Respondent filed briefs in opposition to both motions, to which Alvarado replied.

For the following reasons, Alvarado's Motion for Leave to File an Amended Petition or in the Alternative to File an Amended Traverse (Doc. No. 73) is GRANTED IN PART and DENIED IN PART. Alvarado's Motion to Expand the Record (Doc. No. 72) is also GRANTED IN PART and DENIED IN PART.

## I.  Summary of Facts

Alvarado's habeas petition challenges the constitutionality of his conviction and sentence for murder in the case of State v. Alvarado, Lucas County Court of Common Pleas Case No. G-4801-CR-201301381.  The state appellate court summarized the facts underlying Alvarado's conviction as follows:

> {¶ 2} In the early morning hours of New Year's Day, 2013, a fight broke out at
> the South Beach Bar on Alexis Road in Toledo, Lucas County, Ohio. Christine
> Henderson suffered a fatal wound to her neck and her fiancée, Stacy Bowen,

suffered a non-fatal laceration to his upper arm. Appellant, Hector Alvarado, was indicted on one count of murder in violation of R.C. 2903.02(B) and R.C. 2929.02, and one count of felonious assault in violation of R.C. 2903.11(A)(2). The case proceeded to trial by jury. The following is a summary of the evidence presented.

{¶ 3} Megan Gibson, an employee at the South Beach Bar and Grill, testified that she was working the door in the early morning hours of New Year's Day 2013 when "the bar broke out into a riot." She did not witness the assault on Bowen or Henderson. She did, however, clean-up a large amount of blood in the area Henderson was standing before she walked outside and died in the bar's parking lot.

{¶ 4} A bar patron, Charles Wells, testified that he and three of his friends were on the bar's back patio "smoking weed and drinking beer" when the violent, yet short-lived, fight began. He entered the bar, but never engaged in the fighting. Instead, he stood back and observed the commotion, keeping his eye on appellant because he was "the biggest guy in the bar."

{¶ 5} Wells explained that during the fight appellant had "an object" in his hand. He observed appellant swing the object and noted that "everybody he swung on hurried up and got away from him." Wells admitted that his view was obstructed at times because "bodies was [sic] moving, chairs was [sic] flying, people was [sic] swinging."

{¶ 6} At one point, Wells observed appellant near Henderson. He explained, "I seen him swing on her and she walk [sic] away, she grabbed her neck and walk [sic] away. But I didn't know what had happened right then and there." Wells explained that appellant had the object in his hand when he "swung on" Henderson.

{¶ 7} Before the fight completely subsided, Wells and his friends left the bar through the front door. Wells explained what he observed when he stepped outside:

A:    All I seen was cars, but I immediately spinned around because it was a crowd of people coming out, there was some people coming out, so then when I seen who was coming out, I turned around and started walking backwards and tripped off the curve.

Q:    Did you see [appellant]?

A:    He came out right behind me.

Q:    What did you see him with?

A:     I seen him with a Mexican girl in one hand. I seen him with a knife in another hand.

Q:      Sure it was a knife?

A:      Clearly I seen the knife. I wouldn't turn my back to him because I just seen him get into it with all these black people and I didn't want him to stab me too. I had my brother and them in the car. They made it in the car. I was walking backwards and my brother and them kept saying, Chuck, get in the car; Chuck, get in the car. I said fuck that. I'm watching him. He got a knife.

Q:      How long did you watch him?

A:      All the way until I got in the car.

{¶ 8} Wells explained that he and his friends came back to the bar later that morning so they could give another friend, a bouncer, a ride home. It was then that he heard Henderson had died and that Bowen had killed her with a bottle. He explained, "I said, hell, no, [appellant] did it."

{¶ 9} Wells did not talk to the police in the early morning hours of New Year's Day 2013. He did, however, receive a phone call from Detective Goodlet on January 8, 2013. He told the detective what he saw and agreed to come down to the station and give a recorded statement. He explained,

A:      * * * And the only reason why I really, really went down there, because like I say, I know the family and they was saying that the girlfriend's boyfriend was the one that stabbed her with a bottle and I said, hell no, huh-uh, no. And then I called my friend Dave which [sic] was the bouncer there that night and he asked me was I going down there and I said I'm going to go down there and talk to him.

Q:      Did you ever voluntarily talk to the police before?

A:      Never in my life. Where I come from that's a snitch.

{¶ 10} Wells was able to identify himself on surveillance video and various still photos taken from the video. On cross examination, Wells testified that he and Bowen were not "friends" but that he knew Bowen from the neighborhood and had played basketball with him. He also admitted that he knew Henderson because she drove a recognizable vehicle, a "hot pink truck * * * with cartoon characters on it."

{¶ 11} Dr. Diane Scala–Barnet, a deputy coroner for Lucas County, performed an autopsy on Henderson. She classified Henderson's death as a homicide and determined that a stab wound to the left side of her neck caused a complete transection of the carotid artery. In her opinion, the fatal wound was caused by an instrument with one sharp edge and one dull edge. She ruled out any suggestion that a broken bottle could have caused the wound.

{¶ 12} Dr. Scala–Barnet described the wound track as "lateral to medial and downward." In her opinion, Henderson likely received the wound from a frontal attack but she could not rule out the possibility that the wound was received from an assailant standing behind her. When asked whether it was possible for Henderson to have received the wound while bent over, Dr. Scala–Barnet stated, "[t]hat would be harder to get the downward trajectory * * * It's not impossible, but it's harder to get in there." Dr. Scala–Barnet agreed that if Henderson did receive the wound while bent over, "the assailant would almost certainly have to be lower than her." However, she added that it all depended on where the assailant was positioned relative to the Henderson's body.

{¶ 13} Dr. Scala–Barnet indicated that immediately after being stabbed, blood would have started spurting from Henderson's wound and death would have occurred within a matter of minutes. She indicated that Henderson would have been able to walk after being stabbed, but that she would have felt light headed very quickly.

{¶ 14} Bowen testified that he became involved in the melee after he noticed several of his male friends fighting with people he had never seen before. He didn't know why the fight started and indicated he had no success in trying to break things up. He did not recall fighting with appellant.

{¶ 15} Bowen identified himself, Henderson, and appellant on surveillance footage taken at the bar during the fight. He did not see appellant stab Henderson but he recalled—and the surveillance footage corroborated—that the three of them were in close proximity to each other in the moments before Henderson grabbed her neck and walked away from the melee. However, a table lifted-up and thrown during the fight, obscured the camera at the exact moment Henderson likely received the fatal stab wound to her neck.

{¶ 16} Detective William Goodlet of the Toledo Police Department testified that he interviewed Bowen shortly after the fight. While Bowen admitted to participating in the fight, he was unable to identify anyone he was fighting.

{¶ 17} Detective Goodlet went to a local hospital after receiving information that another potential witness, Basilia Smith, was being treated for injuries she received during the fight. When questioned, Smith admitted to being at the bar and receiving injuries during the melee. However, she was too intoxicated to provide any additional information helpful to the detective's investigation.

{¶ 18} A few hours after he interviewed Smith, Detective Goodlet received surveillance video from the bar's numerous interior and exterior cameras. The time frame of the preliminary video spanned from 1:39:00 a.m. through 2:15:00 a.m. The detective and his team watched the video in real time but found it grainy and "really tough to follow." Detective Goodlet and his team of investigating officers made a determination to start analyzing footage of the back lot where Henderson's body was found and work back in time in an effort to determine

where and when she was injured. At the time, they knew the identities of very few people in the bar. During this period of the investigation, appellant's identity was unknown, but he was one of several "persons of interest" because of his proximity to the victims during the melee.

{¶ 19} A short time later, Detective Goodlet obtained additional surveillance video. After the Detective and his team watched the additional footage, they invited Bowen back in to the station and showed him still shots of the footage. Bowen was able to identify himself, but was not able to identify any of the suspects.

{¶ 20} About a week after the incident, Detective Goodlet received a call from one of the men who had been working security inside the bar. Based upon that conversation, Detective Goodlet made contact with Wells. Detective Goodlet described his first phone conversation with Wells, as follows:

He told me what he had seen, where he was at, he stated he was at the bar with his brother. He's—he's having a good time. There's somebody yelling, security, security, security. He comes out, sees just fighting. People fighting everywhere. He states he runs out of the bar and while he's outside the bar, he sees a large Hispanic male come out of the bar. He's got a girl in his right hand and he's got a knife in his left hand. He said he saw this Hispanic male run, run from the scene, and he said that's the guy, he did it.

A week later Wells came down to the station. During a recorded interview, but after Wells identified a "big Mexican with tattoos on his head," Detective Goodlet showed Wells still shots from the surveillance video. Wells was able to point out the appellant.

{¶ 21} At trial, Detective Goodlet indicated that the majority of Wells' recorded statement was consistent with Wells' testimony in court, with one exception; during the recorded interview, Wells did not indicate that "he observed [appellant] punching or making some striking movement at Miss Henderson."

{¶ 22} Video footage from outside the bar demonstrated that appellant arrived at 12:46 a.m. with three women. A few moments later, video footage from inside the bar depicted the three women walking past the bouncer without being patted down. Detective Goodall testified that the video showed appellant entering the bar after being given a "cursory pat down * * * at best." Detective Goodall pointed out that the bouncer did not pat appellant down towards his ankles or around his back.

{¶ 23} Video footage demonstrates that appellant was on the bar's back patio until approximately 1:55 a.m. At that time, appellant moved into the view of camera 3, inside the bar. At 1:55:58 a.m., appellant is seen on footage from camera 3 and camera 12, seated, taking a brief phone call. There is no sign of any fighting. At 1:59:29 a.m., appellant abruptly stands up. At the same time, camera

11 depicts a fight on the dance floor. In the moments that follow, appellant walks out of and then back into the view of camera 12. Bowen is in the middle of the ruckus, but appellant is not engaged in the fight.

{¶ 24} At 2:00:32 a.m., appellant is seen speaking with one of the women he came into the bar with. Thereafter, appellant moves away from the camera and out of view. At 2:01:42 a.m., Bowen is depicted on camera 12; his shirt and hat are off, and he is picking up and throwing a chair towards the ruckus. At the same time, appellant moves back into view on the far side of the screen. The video footage on camera 12 depicts no fewer than 17 individuals participating in or in close proximity to the ruckus.

{¶ 25} At 2:01:51 a.m., Henderson is depicted on the left front side of camera 12. Appellant is depicted on the center back of the camera's footage. No one appears to be attacking appellant, although a chair is thrown in his general direction. At 2:01:54 a.m., Bowen engages with an unidentified individual. At 2:01:55 a.m., appellant moves toward Bowen and the unidentified individual. Two frames later, appellant and Bowen are depicted near an exit door, arms swinging. At the same time, two individuals in the forefront of the screen pick up chairs, while a third individual picks up a table. At 2:01:58 a.m., Henderson can be seen on the edge of the screen just to the left of Bowen. The table obscures the camera's view of appellant, Bowen, and Henderson.

{¶ 26} Detective Goodall identified both Bowen and Henderson at 2:01:59 a.m. fully engaged in the ruckus. Ms. Henderson appears to be bending over and moving away from the ruckus while Bowen remains engaged with two other individuals. Henderson then stands up and backs away from the commotion. At 2:02:00 a.m., Henderson puts her left hand up to the left side of her neck. She then exits the view of camera 12 while Bowen continues to engage in the ruckus. The view of appellant is obscured for four or five frames. At 2:02:05 a.m., Bowen throws a chair towards appellant and runs out of the view of camera 12. Appellant pushes a few individuals out of the exit door, grabs one of the girls he came in with and exits the bar at 2:02:17 a.m.

{¶ 27} Meanwhile, at 2:02:07 a.m., on camera 3, Henderson is seen walking across the lobby area of the bar towards the bouncer's chair. Detective Goodall points to what he describes as "discoloration" on her shirt and explains that Henderson appears with her left hand on the left side of her neck, under her long dark hair. At 2:02:12 a.m., Wells is seen exiting the bar from the main lobby area. At 2:02:27 a.m., Bowen exits. A dark circle is visible on his upper left bicep in the area of his stab wound.


{¶ 28} At 2:02:31 a.m., on footage from camera 16, appellant is seen running through the parking lot with a woman, a second woman following close behind.

Appellant and both women climb into a pick-up truck, appellant in the passenger seat, and drive towards the entrance to the bar.

{¶ 29} Before the conclusion of Detective Goodall's direct examination, he indicated that to his knowledge, only two individuals received stab wounds during the fight: Henderson and Bowen. A third individual, Smith, was treated at the hospital for injuries inconsistent with a knife wound.

{¶ 30} On cross examination, Detective Goodall confirmed he did not find a knife associated with appellant nor did he find any blood stained clothes in appellant's possession.

{¶ 31} Detective Goodall also confirmed that when he spoke with Wells on January 15, 2013, Wells did not mention that he saw appellant strike Henderson in the neck.

{¶ 32} A recording of appellant's interview with police was shown to the jury. During the interview, appellant indicated he went to the bar with a few girls and he wasn't there long before the fight broke out. He denied seeing any weapons other than beer bottles and chairs. When asked whether he stabbed Henderson, he shook his head "no."

{¶ 33} Following the presentation of evidence, the jury found appellant guilty of murder in violation of R.C. 2903.02(B) and 2929.02, an unspecified felony. Alvarado was found not guilty of felonious assault. The trial court sentenced Alvarado to 15 years to life in prison.

*State v. Alvarado*, 2015 WL 139519 (Ohio App. 6th Dist. Jan. 9, 2015).

## II.    Procedural History

### A.    State Court Proceedings

#### 1.    Trial Court

The January 2013 session of the Lucas County Grand Jury issued an indictment charging Alvarado with one count of murder in violation of Ohio Rev. Code § 2903.02(B) and 2929.02; and one count of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(2). (Doc. No. 12-1, Ex. 1.) Alvarado entered a plea of not guilty. (Doc. No. 12-1, Ex. 2.)

The matter proceeded to jury trial. On August 23, 2013, the jury found Alvarado guilty of murder, but not guilty of felonious assault or the lesser included offense of aggravated assault. (Doc. No. 12-1, Ex.

3.) On September 10, 2013, the trial court sentenced Alvarado to a prison term of 15 years to life. (Doc. No. 12-1, Ex. 4.)

### 2. Direct Appeal

On October 3, 2013, Alvarado, through the same counsel, filed a notice of appeal to the Sixth District Court of Appeals of Ohio ("state appellate court"). (Doc. No. 12-1, Ex. 5.) In his merit brief, Alvarado raised the following four assignments of error:

> I. Prosecutorial misconduct occurred in the State's rebuttal closing when the State impermissibly referred to the content of Appellant's character and the Appellant acting in conformity with that character.
>
> II. The trial court abused its discretion by not sanctioning State for a discovery violation over the objection of defendant.
>
> III. Appellant's conviction was against the manifest weight of the evidence.
>
> IV. There was insufficient evidence to sustain Appellant's conviction.

(Doc. No. 12-1, Ex. 6.) The State filed a brief in opposition. (Doc. No. 12-1, Ex. 7.) The state appellate court affirmed Alvardo's conviction and sentence on January 9, 2015. State v. Alvarado, 2015 WL 139519 (Ohio App. 6th Dist. Jan. 9, 2015).

On February 20, 2015, Alvarado, through new counsel, filed a notice of appeal to the Ohio Supreme Court. (Doc. No. 12-1, Ex. 9.) In his Memorandum in Support of Jurisdiction, Alvarado raised the following five Propositions of Law:

> I. Defective jury instructions that deprive a defendant of substantive rights constitute plain error as described in Crim. R. 52(B) and may be considered by the reviewing court although the error was not objected at trial.
>
> II. When a prosecutor makes impermissible and prejudicial statements in reference to a defendant's character during closing arguments, such comments are improper and prejudicially affect the defendant's constitutional right to a fair trial.
>
> III. Defendant is effectively denied his constitutional right to assistance of counsel where counsel's performance is deficient and there is a reasonable probability that counsel's deficient performance prejudiced defendant, depriving him of his due process right to a fair trial.

IV.    An appellate court has a duty to reverse the conviction and order a new trial where a trial court's verdict is against the manifest weight of the evidence.

V.    A judgment may be reversed if the cumulative effect of multiple errors deprives a defendant of his constitutional rights even though, individually, the errors may not rise to the level of prejudicial error or cause for reversal.

(Doc. No. 12-1, Ex. 10.)  The State filed a brief in opposition.  (Doc. No. 12-1, Ex. 11.)  On July 22, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct. Prac. R. 7.08(B)(4).  (Doc. No. 12-1, Ex. 12.)

### 3.    Application to Reopen Appeal

Meanwhile, on April 7, 2015, Alvarado, through counsel, filed an Application to Reopen his Appeal pursuant to Ohio App. R. 26(B).  (Doc. No. 12-1, Ex. 13.)  Alvarado argued appellate counsel was ineffective for failing to raise the following arguments on direct appeal:

I.    Defendant was effectively denied his constitutional right to effective assistance of counsel during trial.

II.    Defective jury instructions deprived Defendant of his right to a fair trial.

III.    Prosecution's impermissible and prejudicial statements during closing arguments denied Defendant his Constitutional Right to a Fair Trial.

IV.    The Cumulative Prejudicial Effect of the Multiple Errors Defendant Suffered During Trial Deprived Him of Constitutional Rights and Warrant Reversal.

(Doc. No. 12-1, Ex. 13.)  The State filed a brief in opposition.  (Doc. No. 12-1, Ex. 14.)  The state appellate court denied Alvarado's Application on June 8, 2015 on the merits.  (Doc. No. 12-1, Ex. 15.)

On July 17, 2015, Alvarado, through counsel, filed a notice of appeal to the Ohio Supreme Court.  (Doc. No. 12-1, Ex. 16.)  In his Memorandum in Support of Jurisdiction, Alvarado raised the following Propositions of Law:

I.    When reviewing an application to re-open an appeal, the appellate court owes Appellant the right to consider the merits of a claim where it is apparent in the record that there is genuine issue with regard to counsel's effectiveness, in violation of Appellant's constitutionally guaranteed right to the effective assistance of counsel.

II.     When considering an application to re-open an appeal, when presented with genuine issue of with regards to counsel's effectiveness, the appellate court should be required to entertain arguments previously waived as evidence of counsel's alleged ineffectiveness.

(Doc. No.12-1, Ex. 17.) The State filed a brief in opposition. (Doc. No. 12-1, Ex. 18.) On September 30, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4). (Doc. No. 12-1, Ex. 19.)

### 4.     Motion for Leave to File Motion for New Trial

On December 18, 2015, Alvarado, through counsel, filed a Motion for Leave to File a Motion for New Trial in the state trial court. (Doc. No. 12-1, Ex. 21.) Therein, Alvarado argued he was entitled to a new trial based on newly acquired evidence that supported his claims of innocence, ineffectiveness of trial counsel, and prosecutorial misconduct both before and after trial. Most notably, Alvarado attached an affidavit dated November 11, 2015 from the State's key witness, Charles Wells, in which Mr. Wells averred, in relevant part, as follows:

3.     The reason I am here is to clear my conscious. I feel bad. I was coached by the prosecutor and persuaded to lie on the stand. I did not know at the time that I would be their only witness and my testimony was material to their case. Now Hector is serving a life sentence due to my testimony. I am here today to go on the record and set things straight.

          * * *

5.     What happened that night was that we were at the bar, me and a few of my brothers and friends. A fight jumped off and there was a commotion, ripping, running, and people standing off in the cut. I seen the fight and I seen my friend the bouncer trying to break the fights up. After the fight was over, I left the club with my brothers and friends.

6.     I didn't really see nobody with no knife. When I got outside, all I knew was the police was pulling up. We were waiting on my friend Dave, the bouncer, to see if he needed a ride. He told me a girl got stabbed but he didn't need no ride.

7.     A couple of days later, me and my friend Dave was talking and he told me the girl died and it was flashing across the news. My friend Dave reminded me of who Christina Henderson was. Dave used to mess around with her mother. I

remember the girl. I spent a lot of time in the house when she was young, and her mother always treated us like family. She used to cook for us and stuff.

8. Everyone was mad, I couldn't believe she was dead. The family was so upset, I knew I had to help.

9. Next thing I know, Dave told me a bunch of people had been subpoenaed and a bunch of people had already talked. Detectives asked if I would come down and talk too.

10. When I got down there, I already had a case pending. My house got raided for cocaine, heroin, weed, pills, etc. so I was thinking "what can you do for me?" When I first talked to the Prosecutor, they ran the screen the showed me the [surveillance] tape.

11. There was so much commotion, I couldn't really identify the man they wanted me to identify. The prosecutor pointed him straight out to me and I just rolled with it. The Prosecutor talked him so bad and told me he just got out on felonious assault. He said "I just want that fucker back in there so bad" and that was when he pointed him out to me. I did remember seeing Hector, he is noticeable, but I didn't even know who he was and couldn't see him on the video.

12. Even when the Prosecutor pointed Hector out on video, I didn't see any knife in his hand. I did see him fighting, but there was a whole lot of people fighting. There was so much commotion going on I don't think anyone saw who had a knife.

13. Later, I seen Hector in the parking lot leaving, I still didn't see a knife.

14. The Prosecutor said "I will do everything I can to make it go away." [it being the pending charges]. After he promised me that he would make everything go away, he disappeared. I could never get ahold of him and I ended up doing time.

15. The family was so upset I thought I was doing the right thing. It's been on my conscious, it's been weighing on me.

* * *

17. In addition, I want to go on the record and say that [Alvarado's trial counsel] Attorney John Thebes owes me money for a case. He promised to represent me on a charge in 2012, on CRB-12-01061-0202 and appeared twice on my behalf, but never saw the case through. The whole trial with Hector, he never acted like we knew each other and never refunded any of my money.

(Doc. No. 12-1, Ex. 21 at Page ID#s409-410.)

In his motion, Alvarado argued "Wells' affidavit shows that the prosecution, in bad faith, failed to disclose material evidence favorable to defendant, violating Alvarado's due process rights and denying him the right to a fair trial." (*Id.* at Page ID# 387.) Alvarado also asserted "the prosecution's failure to disclose Wells' prospective deal constitutes a Giglio [v. United States, 405 U.S. 150 (1972)] claim and Brady [v. Maryland, 373 U.S. 83 (1963)] error." (*Id.* at Page ID# 389.) Finally, Alvarado argued "Wells' affidavit, in conjunction with Alvarado's affidavit, shows that Alvarado was effectively denied his constitutional right to assistance of counsel." (*Id.* at Page ID# 396.)

Also on December 18, 2015, Alvarado filed a Petition for Post-Conviction Relief pursuant to Ohio Rev. Code § 2953.23. (Doc. No. 12-1, Ex. 22.) The Petition incorporated by reference Alvarado's Motion for Leave to File Motion for New Trial and supporting affidavits. (*Id.*) The Petition raised the following sole ground for relief:

> I.  Freestanding actual innocence mandating relief under the Federal and
>     Ohio Constitutions.

(*Id.*) The State moved to dismiss Alvarado's Motion for Leave and Post-Conviction Petition primarily on the grounds they were untimely filed. (Doc. No. 12-1, Exhs. 23, 24.)

On March 16, 2016, the state trial court denied Alvarado's Motion and Petition on the grounds Alvarado had "failed to establish that he was unavoidably prevented from timely discovering the evidence on which he now relies, and that [Alvarado] has not submitted sufficient evidence of unavoidable delay to merit a hearing on the matter." (Doc. No. 12-1, Ex. 25.)

On April 14, 2016, Alvarado, through counsel, filed a notice of appeal to the state appellate court. (Doc. No. 12-1, Ex. 26.) In his merit brief, Alvarado raised the following grounds for relief:

> I.  The trial court abused its discretion when it denied Mr. Alvarado's motion for
>     leave to file a motion for new trial, without holding a hearing on the issue of
>     whether Mr. Alvarado was unavoidably prevented from discovery of the key
>     witness's recantation.

II.    The trial court erred as a matter of law in denying Mr. Alvarado's petition for post-conviction relief without holding a hearing on the issue of whether Mr. Alvarado was unavoidably prevented from discovery of the key witness's recantation.

(Doc. No. 12-1, Ex. 27.)  The State filed a brief in opposition, to which Alvarado replied.  (Doc. No. 12-1, Ex. 28; Doc. No. 26, Ex. 36.)

On May 12, 2017, the state appellate court affirmed the trial court's denial of Alvarado's Motion for New Trial and Petition for Post-Conviction Relief.  (Doc. No. 26, Ex. 37.)  The state appellate court explained as follows:

{¶28} Here, appellant was convicted in August 2013, and he filed his motion for leave to file a motion for new trial and petition for postconviction relief -in December 2015, well beyond the120-day limit in Crim.R. 33 and the 360-day limit set forth in R.C. 2953.23(A).  Thus, appellant was required to establish that he was unavoidably prevented from timely discovering the evidence upon which he relies.  Moreover, in order for appellant to be entitled to a hearing on his motion for leave or petition for postconviction relief, the evidence submitted to the trial court by appellant must have, on its face, supported his claim that he was unavoidably prevented from timely discovering the evidence upon which he now relies.

{¶29} As an initial matter, we note no argument or issue was raised by appellant at the trial court level or in his briefs before us concerning the timeliness of discovery of the information in the affidavits of Basilia Smith, Nolberto Armenta, DeAna and Mario Parraz and the Toledo Police Department Supplemental Crime Report of Detective Rider, which sets forth a summary of Wells' interview with Detective Goodlet, all of which were filed by appellant in support of his motion for leave and petition for postconviction relief. We will therefore only concern ourselves with whether the affidavits of appellant and Wells, on their face, support the claim that appellant was unavoidably prevented from timely discovering the new evidence on which he relies.

{¶ 30} A review of appellant's affidavit and Wells' affidavit reveals no indication as to why or when Wells had a change of conscience and decided to cooperate and recant his trial testimony.  There is no averment in either affidavit as to what prompted Wells to contact appellant's current counsel, or when or how Wells became aware of appellant's current counsel.  In addition, neither affidavit mentions why appellant nor his counsel did not or could not contact Wells prior to November 2015, when Wells executed his affidavit, to secure Wells' cooperation.

{¶31} In light of the foregoing, we find the affidavits on their face fail to establish that appellant was unavoidably prevented from discovering the new evidence

upon which he now relies. Thus, the trial court did not abuse its discretion in denying both appellant's motion for leave to file a motion for new trial and petition for postconviction relief without holding a hearing. Accordingly, appellant's assignments of error are not well-taken.

(*Id.* at PageID# 1303-1304.)

On June 23, 2017, Alvarado, through counsel, filed a notice of appeal to the Ohio Supreme Court.

(Doc. No. 26, Ex. 38.) In his Memorandum in Support of Jurisdiction, Alvarado raised the following four

Propositions of Law:

I. A defendant's due process rights are violated and he is unavoidably prevented from discovering new evidence when the prosecution (1) withholds material, exculpatory evidence, and (2) knowingly presents false evidence at trial. 5th and 14th Amendments to the United States Constitution; Article I, Section 16, Ohio Constitution; Crim. R.33(B).

II. The requirement in Criminal Rule 33(B) that a defendant show by clear and convincing proof that he was "unavoidably prevented from the discovery of the evidence upon which he must rely" before he may file a motion for new trial based on newly discovered evidence does not require the defendant to contact the prosecution's witnesses and implore them to recant their trial testimony. Crim. R. 33(B). U.S. Const. 6th and 14th Amend.

III. A defendant is denied his right to the effective assistance of counsel when his trial and appellate attorney has an undisclosed conflict of interest that prevents him from timely discovering exonerating evidence, failed to investigate corroborating witnesses, and failed to properly advise on plea. U.S. Const. 6th Amend.; Article I, Section 10, Ohio Constitution.

IV. The conviction and incarceration of an innocent person violates the United States Constitution. U.S. Const. 8th and 14th Amend.

(Doc. No. 26, Ex. 39.) The State filed a brief in opposition. (Doc. No. 26, Ex. 40.) On January 30, 2018,

the Ohio Supreme Court declined to accept jurisdiction of the appeal pursuant to S.Ct.Prac.R. 7.08(B)(4).

(Doc. No. 26, Ex. 41.)

**B.     Proceedings in this Court**

On October 20, 2016, Alvarado, through counsel, filed the instant Petition, raising the following nine grounds for relief:

I.      The prosecutor violated Petitioner's right to a fair trial by improper and prejudicial statements.

II.     The State violated Petitioner's rights to due process and fair trial when it suppressed favorable, material evidence.  Brady v. Maryland, 373 U.S. 83 (1963).

III.    The State violated Petitioner's right to due process and fair trial when it presented false evidence or allowed it to go uncorrected.

IV.     The evidence against Petitioner is insufficient to sustain his conviction, thus violating Petitioner's due process rights under the 14th Amendment.

V.      Petitioner is actually innocent of the crime for which he was convicted, and his convictions violate the 14th Amendment.

VI.     The trial court violated Petitioner's rights to due process and fair trial by erroneously instructing the jury and relieving the State from its burden of proving every element of the offense charged beyond a reasonable doubt.

VII.    Petitioner was denied his constitutional right to assistance of counsel provided by the Sixth Amendment.

VIII.   Petitioner was denied his right to effective assistance of appellate counsel. U.S. Const. Amends. VI and XIV.

IX.     Petitioner was denied his constitutional right to conflict free counsel when his attorney had both represented Petitioner and the State's main witness against Petitioner.

(Doc. No. 1.)[1]

Shortly thereafter, on October 28, 2016, Alvarado filed a Motion for Stay and Abeyance.  (Doc. No. 5.)  In his Motion, Alvarado argued his Second, Third, Fifth, Seventh and Ninth Grounds for Relief were not yet exhausted because they were raised in his Motion for Leave to file Motion for New Trial and Petition for Post-Conviction Relief, both of which were the subject of his then- pending appeal in the state appellate court.  Alvarado maintained his habeas petition should be stayed because "there is good cause

---

[1] In his Traverse, Alvarado withdrew his Sixth Ground for Relief.  (Doc. No. 32 at 38.)

for his failure to exhaust his claims, his claims are potentially meritorious, and he has not intentionally engaged in dilatory tactics." (*Id.* at 4.) Respondent filed a cursory opposition to Alvarado's Motion to Stay on November 17, 2016, in which it principally argued the Motion was "premature." (Doc. No. 9.)

On December 27, 2016, Respondent filed its Return of Writ, along with portions of the state court record. (Doc. No. 12.) Therein, Respondent argued the majority of Alvarado's claims (including those that were the subject of his Motion to Stay) were procedurally defaulted. (*Id.*) Respondent further maintained Alvarado had failed to establish cause and prejudice, or actual innocence, to excuse the default. (*Id.*)

On February 7, 2017, the undersigned issued a Report & Recommendation that Alvarado's Motion to Stay be granted in order to allow him to exhaust his Second, Third, Seventh and Ninth Grounds for Relief. (Doc. No. 17.) No objections were filed, and, on March 3, 2017, the Report & Recommendation was adopted, and the instant matter was stayed. (Doc. No. 18.) Alvarado was instructed to (1) file quarterly status reports in this Court regarding the progress of his state court appeal; and (2) seek reinstatement on this Court's active docket within thirty days of fully exhausting his state court remedies. (*Id.*)

Alvarado filed Quarterly Status Reports on March 28, June 28, September 29, and December 29, 2017. (Doc. Nos. 19, 20, 21, 22.) On February 26, 2018, Alvarado filed a Notice that he had exhausted his claims in state court, and requested the Petition be reinstated to the Court's active docket. (Doc. No. 23.) Alvarado's request was granted shortly thereafter, and this matter was referred to the undersigned for further proceedings. (Doc. No. 24.)

On March 2, 2018, the undersigned ordered Respondent to supplement the state court record to reflect proceedings occurring during the stay of the instant Petition. (Doc. No. 25.) Respondent filed a Supplemental State Court Record on April 2, 2018. (Doc. No. 26.)

On May 8, 2018, Alvarado filed a Motion for Discovery regarding his Second, Third, Seventh and Ninth Grounds for Relief. (Doc. No. 28.) Therein, he requested leave to conduct the depositions of Charles Wells; defense attorney John Thebes; Toledo Police Detectives William Goodlet and Tonya Rider; and Lucas County Prosecutors Michael Bahner, Clinton Wasserman, and Charles McDonald. (Id. at 2.) Alvarado also sought leave to obtain copies of (1) all files concerning his own prosecution; (2) all files concerning the prosecution of Charles Wells in Lucas County Court of Common Pleas Case Nos. G-4801-CR-201302717-000 and G-201301780-000; and (3) all files "concerning the incident at the South Beach Bar and Grill on December 31, 2012 and January 1, 2013, and the murder of Christina Henderson and assault on Stacey Bowen, in possession of the Toledo Police Department." (*Id.*) Respondent filed a brief in opposition, to which Alvarado replied. (Doc. Nos. 30, 31.)

On May 21, 2018, Alvarado filed a Motion to Expand/Complete the Record, in which he sought an Order requiring Respondent to submit the exhibits from his underlying state court trial. (Doc. No. 29.) Respondent filed a brief in opposition, to which Alvarado replied. (Doc. Nos. 33, 34.)

Meanwhile, and while these Motions were pending, Alvarado filed his Traverse on June 1, 2018. (Doc. No. 32.) Respondent filed a Sur-Reply to the Traverse on June 18, 2018. (Doc. No. 35.)

On September 18, 2018, the undersigned granted in part (as to Grounds Two and Three) and denied in part (Grounds Seven and Nine) Alvarado's Motion for Discovery (Doc. No. 28) and granted his Motion to Expand/Complete the Record (Doc. No. 29). (Doc. No. 36.) On September 21, 2018, Respondent filed objections to the Order granting the motion for discovery (Doc. No. 37), to which Alvarado responded (Doc. No. 38). On November 5, 2018, the Court accepted the undersigned's Order granting in part and denying in part the motion for discovery and granting the motion to expand/complete the record. (Doc. No. 39.)

Alvarado had until September 30, 2019 to file a motion for leave to amend his petition and/or traverse and a motion to expand the record. (Non-document Order dated July 22, 2019.) On September 30, 2019, Alvarado filed his: (1) Motion for Leave to File an Amended Petition or in the Alternative to File an Amended Traverse (Doc. No. 73); (2) Motion to Expand the Record under Rule 7 (Doc. No. 72); and (3) Unopposed Motion for Order to File Exhibit Under Seal (Doc. No. 71).

On October 2, 2019, the Court granted Alvarado leave to file an exhibit under seal. (Doc. No. 74.)

On October 30, 2019, Respondent filed responses in opposition to Alvarado's motion to amend and motion to expand the record (Doc. Nos. 76, 77), to which Alvarado replied (Doc. Nos. 78, 79).

### III.     Motion for Leave to Amend

#### A.     Standard

It is well established that Rule 15 of the Federal Rules of Civil Procedure applies to a habeas petitioner's request for leave to amend his petition. *Mayle v. Felix*, 545 U.S. 644, 655, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005). *See also Glenn v. Coleman*, 2014 WL 4983661, at *5 (N.D. Ohio Oct. 6, 2014); *Shank v. Mitchell*, 2013 WL 3208554 at *3 (S.D. Ohio June 24, 2013). Under Rule 15(a), a party may amend his or her pleadings once as a matter of course within twenty-one days after serving it or, if the pleading is one to which a responsive pleading is required, twenty-one days after service of a responsive pleading. Fed. R. Civ. P. 15(a). Otherwise, the party may amend only with the opposing party's written consent or by leave of court, which "shall be freely given when justice so requires." *Id. See also Mayle*, 545 U.S. at 655.

As Respondent filed his Answer/Return of Writ on December 27, 2016, leave of court must be obtained before Alvarado may amend his Petition. In determining whether leave should be granted, a habeas court should consider several factors, including "[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous

18

amendments, undue prejudice to the opposing party, and futility of amendment." *Coe v. Bell*, 161 F.3d 320, 341 (6th Cir.1998) (quoting *Brooks v. Celeste*, 39 F.3d 125, 130 (6th Cir.1994).) *See also Powers v. Beightler*, No. 5:08CV00520, 2010 WL 649623, at *1 (N.D. Ohio Feb. 19, 2010). If a proposed amendment lacks merit on its face, it is deemed futile. *See e.g., Moss v. United States*, 323 F.3d 445, 475 (6th Cir. 2003). *See also Clark v. Ohio Adult Parole Authority,* Nos. 2:16-cv-00204, 2:16-cv-00413, and 2:16-cv-00414, 2017 WL 495508, at *6 (S.D. Ohio Feb. 6, 2017); *Brown v. Clipper*, No. 5:14CV1406, 2016 WL 5173331, at *20 (N.D. Ohio Sept. 21, 2016); *Soler-Norona v. Brewer*, No. 17-11357, 2018 WL 1964677, at *1 (E.D. Mich. April 26, 2018). In the Sixth Circuit, leave to amend a pleading may be denied on grounds of futility only if the amended pleading would not withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Kottmyer v. Maas*, 436 F.3d 684, 691–92 (6th Cir. 2006); *Hall v. Clipper*, No. 1:10-cv-1340, 2011 WL 2671310, at *11 (N.D. Ohio July 8, 2011). "Courts have interpreted Rule 15(a) 'as setting forth a liberal policy of permitting amendments to ensure the determination of claims on their merits.'" *Phillips v. Smith*, No. 5:09CV1848, 2010 WL 2291143, at *2 (N.D. Ohio Jun. 2, 2010) (quoting *Long v. Warden, Warren Corr. Institution*, 2009 WL 3169964 (S.D. Ohio Sept. 28, 2009)) (additional internal quotation marks omitted).

Following the discovery allowed regarding Grounds Two and Three, Alvarado seeks to amend his Petition as to Grounds One, Two, Three, and Five, or in the alternative, his Traverse. (Doc. No. 73.) Respondent opposes amendment, arguing that amendment as to each of these grounds is futile. (Doc. No. 77.)

### B.    Analysis

#### 1.    Grounds One, Two, and Three

As noted *supra*, Respondent argued many of the grounds presented in Alvarado's habeas petition were procedurally defaulted, including the third remark raised in Ground One and Grounds Two and

Three.  (Doc. No. 12 at 19-24; Doc. No. 35 at 2-9.)  Alvarado argues the information gathered during discovery helps demonstrate cause and prejudice and actual innocence to excuse the procedurally defaulted claims, in addition to supporting his grounds for relief.  (Doc. No. 73 at 5-21; Doc. No. 79 at 3-14.)  Respondent does not assert that there has been undue delay in Alvarado's filing of the motion to amend, lack of notice, that Alvarado acted in bad faith, or a likelihood of undue prejudice to Respondent if forced to respond to the amended claims.  (Doc. No. 77.)  Rather, Respondent asks the Court to deny the motion to amend because any amendment would be futile.  (*Id.*)  As to Ground One, Respondent argues: (1) *Cullen v. Pinholster* bars the Court from considering Alvarado's new evidence when reviewing the merits relating to the first and second remarks as the state courts considered and ruled on the merits of those claims; (2) the third remark raised in the Petition was procedurally defaulted and the information obtained in discovery does not excuse the defaults; and (3) to the extent Alvarado alleges that the Crime Stoppers tips were not provided in open file discovery, any claims related to those documents are unexhausted.  (*Id.* at 11.)  As to Grounds Two and Three, Respondent appears to argue the evidence obtained through discovery does not establish cause and prejudice or actual innocence to excuse the procedurally defaulted claims.  (*Id.* at 13-20.)

As this district has previously explained in a case where the Respondent opposed amendment solely on futility grounds:

> Futility, alone, can constitute a satisfactory ground for denying a motion for leave to amend.  *See generally Wiedbrauk v. Lavigne, 174 Fed. Appx. 993 (6th Cir. 2006)* (affirming denial of motion to amend when amendment would have been futile).  Permission to amend, however, should be granted freely when justice so requires.

*Phillips*, 2010 WL 2291143, at *2.  "Recognizing that these theories exist in tension rather than harmony with one another," the Court allowed Phillips to amend his Petition.  *Id.*

The Court cannot conclude from the face of Alvarado's motion to amend that the proposed amendments as to Grounds Two and Three are clearly frivolous or legally insufficient.  *See McNeill v.*

*Bagley*, No. 1:02 CV 1645, 2018 WL 3348876, at *8 (N.D. Ohio July 9, 2018) ("A proposed amendment, however, must be frivolous or legally insufficient on its face to warrant denial of leave to amend on [futility grounds].") (internal citations omitted). Respondent's procedural default defense should be raised in the answer to Alvarado's amended Petition, "allowing [Alvarado] the opportunity to respond fully and the Court to consider all issues in light of the entire record." *Id.*

In addition, Respondent fails to mention "the most critical factors in determining whether to grant leave to amend: notice and substantial prejudice to the opposing party." *Id.* (citing *Coe*, 161 F.3d at 341). And the Court finds no prejudice in allowing Alvarado to amend his Petition with respect to Grounds Two and Three. "Respondent has long been aware of" Alvarado's *Brady* and *Giglio* claims, and "little additional work on [Respondent's] part should be required to address them." *Id.* Therefore, the Court grants Alvarado's motion to amend Grounds Two and Three of his Petition. As the Court is already allowing amendment of the Petition on other grounds, without reaching the merits in any way and out of an abundance of caution under the circumstances presented with respect to Ground One, the Court will allow Alvarado to amend his Petition as to Ground One as well.

### 2. Ground Five

In his Fifth Ground for Relief, Alvarado asserts he is actually innocent. The Sixth Circuit, however, has repeatedly held that actual innocence is not cognizable as a free-standing habeas claim, particularly in the context of non-capital proceedings. *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007). *See also Thomas v. Perry*, 553 F. App'x 485, 486 (6th Cir. 2014) ("Thomas' freestanding claim of actual innocence based on newly discovered evidence is not cognizable on federal habeas review"); *Sitto v. Lafler*, 279 F. App'x 381, 382 (6th Cir. 2008) ("[W]e continue to adhere to the rule that a free-standing innocence claim is not cognizable for habeas review"); *Wright v. Stegall*, 247 F. App'x 709, 711 (6th Cir. 2007) ("Since the Supreme Court has declined to recognize a freestanding innocence claim in habeas

corpus, outside the death-penalty context, this court finds that petitioner's claim is not entitled to relief under available Supreme Court precedent."); *Hoop v. Jackson*, 2015 WL 6735895, at *22 (S.D. Ohio Nov. 4, 2015) ("Case law in the Sixth Circuit establishes that the Supreme Court of the United States has never recognized a free-standing or substantive actual innocence claim."); *Carter v. Bradshaw*, 2015 WL 5752139, at *51 (N.D. Ohio Sept. 30, 2015); *Keenan v. Bagley*, 2012 WL 1424751, at n.28 (N.D. Ohio April 24, 2012); *Johnson v. Kelly*, 2015 WL 1298711, at *11 (N.D. Ohio March 23, 2015) (adopting report and recommendation). Therefore, amendment of Ground Five would be futile. Alvarado's motion to amend Ground Five is DENIED.

## IV. Motion to Expand/Complete the Record

In his Motion to Expand the Record, Alvarado requests the Court allow him to expand the record with the deposition transcripts and exhibits in support of his First, Second, Third, and Fifth Grounds for Relief. (Doc. No. 72 at 4.) Alvarado asserts Rule 7 of the Rules Governing §2254 Cases permits expansion of the record with relevant documents and exhibits, and the proposed documents and exhibits are relevant to demonstrate cause and prejudice and to his claims. (*Id.* at 4-13.)

Respondent argues Alvarado's motion should be denied because "Alvarado has not demonstrated that he was not at fault for failing to develop the evidence in state court. Alvarado also cannot introduce new evidence because he cannot satisfy 28 U.S.C. 2254(e)(2)(A)-(B). Alvarado has failed to demonstrate that the factual predicates of his claims could not have been previously discovered through the exercise of due diligence." (Doc. No. 76 at 5.)[2] Further, Respondent argues a portion of Alvarado's First Ground for

---

[2] In a footnote, Respondent also "notes that in considering the depositions, the Court should resolve the objections. Additionally, Respondent notes that none of the witnesses were able to authenticate deposition exhibits 30 and 52; thus, they are not admissible. Additionally, deposition exhibits 4A, 43, 44, 45, 66, and 73 contain personal identifiers." (Doc. No. 76 at 1.) Alvarado did not respond to Respondent's argument in his reply. (Doc. No. 78.) First, suffice it to say, such important arguments should not be relegated to footnotes. Second, in light of any specific argument by Respondent and lack of response by Alvarado, the Court declines Respondent's footnote invitation to rule on all objections raised in the deposition

Relief was reviewed on the merits, and thus *Pinholster* bars this Court from considering any evidence that was not before the state court when it reviewed his claims. (*Id.* at 12.) In addition, Respondent argues Alvarado's Fifth Ground for Relief is non-cognizable. (*Id.* at 12-13.)

Alvarado replies that: (1) *Pinholster* does not prohibit this Court from expanding the record; (2) "courts in this Circuit do not require a petitioner to meet the standards laid out in 2254(e)(2) before expanding the record"; and (3) section 2254(e)(2) only applies to claims – therefore, the Court may expand the record "for purposes of considering threshold issues such as procedural default and actual innocence." (Doc. No. 78.)

As this Court recently explained:

> Motions to expand the record under Rule 7 must meet the standards of AEDPA's § 2254(e)(2), although that provision is expressly directed only at evidentiary hearings. *Holland v. Jackson,* 542 U.S. 649, 653 (2004) (per curiam) ("Those same restrictions [of § 2254(e)(2)] apply *a fortiori* when a prisoner seeks relief based on new evidence *without* an evidentiary hearing." (emphasis original)). Section 2254(e)(2) precludes an evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings" unless the applicant satisfies certain conditions.[12] 28 U.S.C. § 2254(e)(2).
>
> Under AEDPA, therefore, a prisoner may introduce new evidence in support of a claim in the district court "only if [the prisoner] was not at fault in failing to develop that evidence in state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met." *Holland,* 542 U.S. at 652–53. A prisoner is at fault in failing to develop the evidence if there is a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). The required diligence is "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. "[C]omity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop

---

transcripts, in addition to the specific objections to exhibits 30 and 52, at this stage of the proceeding. To the extent Respondent has specific objections to evidence raised in Alvarado's amended Petition, Respondent shall properly raise and brief those objections in response to Alvarado's amended Petition, to which Alvarado shall respond. Regarding the personal identifiers in deposition exhibits 4A, 43, 44, 45, 66, and 73, the Court seals the deposition exhibits at Doc. No. 72-7. Alvarado shall refile the deposition exhibits with the personal identifiers redacted.

>his claim in state court despite diligent effort. In that circumstance, an evidentiary
>hearing is not barred by § 2254(e)(2)." *Id.*

*McNeill*, 2018 WL 3348876, at **8–9.

Wells executed his recantation affidavit in November 2015. (Doc. No. 12-1, Ex. 21.) On December 18, 2015, Alvarado filed a Motion for Leave to File Motion for New Trial and a Petition for Post-Conviction Relief. (Doc. No. 12-1, Ex. 21, 22.) In his Motion for Leave to File a Motion for a New Trial, Alvarado requested in the alternative the trial court hold a hearing before reaching a decision on his motion. (Doc. No. 12-1, Ex. 21 at 31-33.) The trial court determined Alvarado failed to establish he was "unavoidably prevented from timely discovering" this evidence (Doc. No. 12-1, Ex. 25), which Alvarado strongly disputed (and continues to dispute – *see* Doc. Nos. 72, 78). Alvarado appealed the trial court's denial of his Motion for Leave to File a Motion for a New Trial and his Petition for Post-Conviction Relief all the way up to the Ohio Supreme Court. (Doc. No. 12-1, Ex. 26; Doc. No. 26, Ex. 38.)

In the undersigned's Report and Recommendation on Alvarado's motion to stay-and-abey this case to exhaust certain state court remedies, in considering the factors under *Rhines v. Weber*, 544 U.S. 269 (2005) as to whether stay and abeyance were proper, the undersigned found with respect to whether there was any evidence Alvarado engaged in "intentionally deliberate litigation tactics" as follows: "Lastly, the Court finds there is no evidence that Alvarado has engaged in intentionally dilatory litigation tactics. *Wells executed his recantation affidavit in November 2015, and Alvarado promptly filed his Motion for Leave to file New Trial Motion and Petition for Post-Conviction Relief the following month.*" (Doc. No. 17 at 23) (emphasis added). No objections were filed in response to that Report and Recommendation, which the Court adopted on March 3, 2017. (Doc. No. 18.)

The Court finds, under the circumstances presented here, that Alvarado demonstrated the requisite diligence in attempting to develop the factual basis of his *Brady* and *Giglio* claims, as well as his

prosecutorial misconduct claim,[3] in state court, and he may expand the record to include the deposition transcripts and exhibits into the record without satisfying § 2254(e)(2)'s conditions.[4] *McNeill*, 2018 WL 3348876, at *9 (citing and quoting *Getsy v. Mitchell*, 495 F.3d 295, 310 (6th Cir. 2007) ("Getsy sought to develop evidence regarding his judicial-bias claim both at trial and in his postconviction proceedings in state court. He has thus demonstrated diligence in accordance with § 2254(e)(2)."); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) ("In the case before us, petitioner pursued his ineffective assistance of appellate counsel claim with proper diligence, raising it first—albeit prematurely—in his petition for post-conviction relief and then in his motion for delayed reconsideration. Both of these pleadings requested an evidentiary hearing, which was never afforded by the Ohio courts. Consistent with *Williams v. Taylor*, therefore, we conclude that petitioner is not precluded from an evidentiary hearing as he exercised the necessary diligence in attempting to establish the factual record in state court."); and *Hoffner v. Bradshaw*, No. 3:05 CV 687, 2007 WL 3171631, at *3 (N.D. Ohio Oct. 29, 2007) (Gwin, J.) ("Petitioners who request an evidentiary hearing in the appropriate state court proceedings are sufficiently diligent, even when the state court fails to grant the request.") (citing *Greer*, 264 F.3d at 681)).

However, as the Court found above that amendment of Alvarado's free-standing claim of innocence in Ground Five would be futile, the Court denies Alvarado's request to expand the record as to Ground Five.

Alvarado's request to expand the record to include the deposition transcripts and exhibits is GRANTED IN PART AND DENIED IN PART.

---

[3] In so finding, the Court does not reach the merits of any exhaustion, procedural default, or other defenses that may be asserted with respect to these claims.

[4] As discussed in n.2, *supra*, the Court reserves ruling on any evidentiary objections. The parties shall address any specific evidentiary objections in their briefs.

## IV.    Conclusion

Accordingly, and for all the reasons set forth above, Alvarado's Motion for Leave to File an Amended Petition or in the Alternative to File an Amended Traverse (Doc. No. 73) is GRANTED IN PART and DENIED IN PART as set forth in this Order.  Alvarado's motion to expand the record (Doc. No. 72) is GRANTED IN PART and DENIED IN PART.

Given the personal identifiers in deposition exhibits 4A, 43, 44, 45, 66, and 73, the Court SEALS Doc. No. 72-7.  Alvarado shall file promptly the deposition exhibits with the personal identifiers redacted.

Alvarado shall file his amended Petition by March 4, 2020.  Respondent shall file a Return to the Amended Petition no later than 60 days from the filing of the amended Petition; *i.e.*, May 4, 2020. Alvarado shall file a Traverse no later than 30 days from the filing of the Return; *i.e.*, June 3, 2020. Respondent may file a sur-reply no later than 15 days from the filing of the Traverse; *i.e.,* June 18, 2020. Given the passage of time in this case, the parties should not expect any extensions of these deadlines.

**IT IS SO ORDERED.**


Date:  February 3, 2020                              *s/ Jonathan Greenberg*
                                               Jonathan D. Greenberg
                                               United States Magistrate Judge